[Civ. No. 37529. Second Dist., Div. Five. Nov. 30, 1971.]

ELMER N. MARSHALL, JR., Plaintiff and Appellant, v.
FAIR EMPLOYMENT PRACTICE COMMISSION,
Defendant and Respondent;
SOUTHERN PACIFIC TRANSPORTATION COMPANY,
Real Party in Interest.

## Counsel

Edward J. Owen, Thomas P. Burke, Morton M. Sider, Bennett Rolfe and Myles Phillip Burton for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, and Robert H. O'Brien, Assistant Attorney General, for Defendant and Respondent.

William R. Denton, Robert S. Bogason and William E. Still for Real Party in Interest.

## Opinion

KAUS, P. J. — Petitioner Elmer N. Marshall, Jr., appeals the superior court's denial of a writ of mandamus directed to the respondent, the Fair Employment Practice Commission of the State of California ("FEPC" or "commission"). The purpose of the writ proceeding was to have the court order the FEPC to hold a hearing on a complaint filed with it by petitioner and directed against the real party in interest, the Southern Pacific Transportation Company ("Southern Pacific").

## FACTS

In the complaint which was filed on July 29, 1968, petitioner claimed that during the night shift on July 21, 1968, a Caucasian supervisor of his unit, known to him only by his first name Charlie, yelled at him and called him a "nigger." Other employees were present. Petitioner became so upset that he attempted to strike Charlie. As a result of the altercation petitioner was terminated, but Charlie was not disciplined. Charlie had a reputation for his hostile attitude toward Negroes, continually harassed them and caused one, Gloria, to resign because of his uncivil treatment.

Petitioner's complaint was investigated on behalf of the FEPC by one Robinson. Robinson was unable to find eyewitnesses through the Southern Pacific. He then got in touch with petitioner who promised to produce the names, addresses and telephone numbers of three persons whom Robinson could interview. A few days later petitioner gave Robinson the names of three persons who, he claimed, could give testimony in support of his complaint. One of these was interviewed by telephone. He could not contribute anything because he had not seen the fight. In fact he worked on a different shift. The other two whom petitioner identified only by their first names, Gloria and Daisy, could not be located. The Southern Pacific apparently had given Robinson written statements concerning the incident in question. They are not part of the record before us. In any event because of what they contained and because of lack of evidence to support petitioner, Robinson recommended on August 16, 1968, that the file be closed. On August 23 Commissioner Stella C. Sandoval approved the recommendation.

Under the rules of the FEPC that decision was appealable (8 Cal. Admin. Code, § 303 (e)) and petitioner appealed claiming, in effect, that the commission's investigation had not been sufficiently thorough. On March 24, 1969, the chairman of the FEPC ordered the matter reopened. This time it was investigated by one Herritt. Petitioner's attorney, by letter, broadened the grievance by claiming on behalf of his client that petitioner had been assigned to the unit in which he worked at the time of the incident because of racial discrimination, that his termination was the result of such discrimination and that, generally, the promotion practices of Southern Pacific were racially discriminatory.

On April 30, 1969, Herritt interviewed petitioner in the office of his attorney. He was given petitioner's version of the incident. The attorney gave Herritt a summary of an oral statement given by one Gloria Prescott to the attorney's investigator. Gloria had not wanted to give the investigator a formal written statement. Gloria claimed that she did not hear Charlie

call petitioner a nigger, but remembers that he did make a "slant" remark. She heard Charlie accuse petitioner of slapping him. She did not actually see the incident because she was working. She stated—still to the investigator—that one Corbett, identified elsewhere in the record as the Southern Pacific's Chief Clerk, had a discriminatory attitude toward Negroes and that the company engaged in discriminatory practices.

Herritt then wrote to Gloria asking her to get in touch with him. She never did. He then apparently interceded with the Southern Pacific on petitioner's behalf and on June 3, 1969, telephoned petitioner to tell him that he would be rehired, but only under certain conditions which were unacceptable to petitioner.

Further investigation with the Southern Pacific revealed that Charlie, whose last name was now known to be Loper, had resigned from the company. It later appeared he had moved to Eugene, Oregon, and he never was interviewed. An interview with Corbett disclosed that petitioner, at one point, had stated to Corbett that he had "knocked [Loper's] God damn fucking block off." It appears from the interview with Corbett that he had been a witness at least as far as the tail-end of the physical part of the incident is concerned and that he had tried to separate petitioner from Loper. Corbett could not remember whether petitioner had accused Loper of calling him a nigger. Petitioner was terminated because of insubordination.

When his investigation was completed Herritt recommended that the matter be again closed. His recommendation was based chiefly on his inability to obtain evidence corroborating the charge that Loper had called petitioner a "nigger." He also referred to inconsistencies in petitioner's description of the struggle that followed and noted that whatever evidence concerning the struggle he had obtained from Corbett indicated that petitioner's last attempt to strike Loper was "somewhat removed in time" from Loper's alleged use of the racial epithet.

Herritt reported further that he had been unable to find any evidence that petitioner's termination was the result of racial discrimination.

The record before us gets a little muddy at that point. All we know is that Herritt's recommendation was dated July 31, 1969, and that on December 10, 1969, another appeal by petitioner was denied by the FEPC. The instant petition for the writ of mandamus was filed on January 14, 1970.

### DISCUSSION

■ It is appellant's position that he was entitled to the issuance of an

accusation and a formal hearing because his complaint alleged facts which, if true, constituted an unfair employment practice. (Lab. Code, § 1420.)[1] Petitioner's argument is based on his interpretation of the California Fair Employment Practice Act (§ 1410 et seq.) and the due process clause of the Fourteenth Amendment.

We find nothing in the statute to support petitioner's position. After defining unlawful employment practices in section 1420, it provides for *sua sponte* investigations by the FEPC in section 1421 and in section 1422 allows any person to file a verified complaint. Section 1423 directs that an investigation be made and an accusation filed "where warranted by the evidence." Then, at the hearing, which must be conducted in accordance with the Administrative Procedure Act (Gov. Code, § 11500 et seq.; Lab. Code, § 1424) the case in support of the accusation is presented before the commission "by one of its attorneys or agents." (Lab. Code, § 1425.)

Petitioner's argument, if correct, would lead to strange anomalies. The investigation called for in section 1423 is to be made as provided in section 1421 which calls for investigations when it appears "that an unlawful employment practice may have been committed." Thus the allegations in a complaint serve no purpose other than to get an investigation in motion. If any person by merely alleging an unfair employment practice is assured of an eventual hearing, then the statute either means that once such a complaint is filed the commission really has no choice and must order a hearing regardless of what the investigation turns up, or, conversely, that it must order an investigation even if the complaint does not allege a violation. Either result is absurd. The first does violence to section 1423 which clearly reposes discretion in the commission with respect to the issuance of accusations; the second would have the Legislature prescribe investigations on the basis of complaints that say nothing.

Finally, if the Legislature had intended that a complainant is entitled to a formal hearing even if the commission does not think he has a case, it would hardly have provided that at such a hearing the charges contained in the accusation be presented by its own attorneys or agents.

Citing *Alcorn* v. *Anbro Engineering, Inc.,* 2 Cal.3d 493, 499-501 [86 Cal.Rptr. 88, 468 P.2d 216], petitioner seems to claim that proceedings before the commission are his sole remedy for the unfair practice to which he was allegedly subjected. We cannot agree. True, it has been held that

---

[1]Unless otherwise noted all code references are to the Labor Code.

exhaustion of remedies before the commission is a prerequisite to certain civil actions against the employer (*Hollon* v. *Pierce,* 257 Cal.App.2d 468, 475-476 [64 Cal.Rptr. 808]), but there is nothing in *Alcorn* to suggest that commission proceedings are the employee's exclusive remedy. With respect to the Fair Employment Practice Act the case merely holds that its enactment at the same session which saw the passage of the Unruh Civil Rights Act (Civ. Code, § 51 et seq.) indicates that the Legislature did not intend the latter act to encompass job discrimination.

The constitutional argument advanced by petitioner relies solely on *Goldberg* v. *Kelly,* 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011], and *Caulder* v. *Durham Housing Authority,* 433 F.2d 998. Neither case is in point. *Goldberg* deals with the constitutional right to a hearing before the termination of welfare benefits; *Caulder* tackles the same problem in connection with evictions from public housing projects. Both simply hold that state deprivals of state conferred benefits must, in those situations, be preceded by hearings held in conformity to rudimentary due process notions. In the case at bar the state has not deprived petitioner of anything. It has merely refused to act affirmatively. The availability of judicial relief in a proper case seems adequate protection against arbitrary actions by the commission.

Of course, no such arbitrary refusal to proceed to a hearing is shown here. While the commission investigation may not have been the most complete imaginable, neither is the record furnished to us.[2] Without again going into details, the decision to drop the matter was well within the limits of the discretion which the Legislature granted the commission.

Finally, petitioner has brought up statistics concerning the commission's activities during a period of about 10 years preceding November 30, 1969. They are designed to show that a substantial majority of complaints filed with the commission are dismissed for insufficient evidence of discrimination.

Just what conclusion we are to draw from the figures submitted, we do not really know. Perhaps a majority of complaints really have no validity. Perhaps the commission operates on a tight budget, which does not permit full scale prosecution of any but the most promising cases. Perhaps the commission, in order to maintain its effectiveness, does not want to prosecute marginal cases which offer a negligible chance of success. If that is so, surely it is a discretionary administrative decision with

---

[2]In particular we do not have the Southern Pacific's own investigation which was considered by the commission.

which we have no right to interfere as long as there is no violation of the legislative mandate.

The judgment is affirmed.

Stephens, J., and Aiso, J., concurred.