[No. B029148. Second Dist., Div. Seven. Aug. 8, 1989.]

JOYCE WATSON, Plaintiff and Appellant, v.
DEPARTMENT OF REHABILITATION, Defendant and Appellant.

**COUNSEL**

Jerry L. Webb for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Henry G. Ullerich and Thomas Scheerer, Deputy Attorneys General, for Defendant and Appellant.

## OPINION

**NEWMAN, J.***—The State of California Department of Rehabilitation (State and agency) appeals from a judgment awarding Joyce Watson (Watson), a civil service employee of the State, damages of $1.5 million after a jury trial. Watson proceeded to trial on two statutory causes of action for race and age discrimination in violation of Government Code sections 12940 and 12941, and a third cause of action for breach of the covenant of good faith and fair dealing. The State seeks reversal of the judgment and dismissal of the action; alternatively a remittitur limiting the damages award or a new trial. Although we agree with the State that damages for breach of the covenant of good faith and fair dealing may not be recovered by this state employee, we affirm the judgment on the statutory causes of action and find that they support the damages found and awarded by the jury.

### PROCEDURAL HISTORY

Watson sought a promotion from her clerical position of intake clerk to vocational rehabilitation assistant in a promotional examination given in August 1977. She did not receive the promotion; the position went to a Caucasian. Watson filed a charge on March 28, 1978, with the Department of Fair Employment Practices (DFEP) alleging that the denial of promotion was based on her race. She received a "right-to-sue" letter from the DFEP on August 31, 1978. Thereafter on January 8, 1979, Watson filed suit alleging violation of former Labor Code section 1420, the predecessor of Government Code section 12940. In one cause of action, Watson sought injunctive relief and damages of $100,000. She described herself as Mexican-American and Asian-American in that complaint. The defendants, the State and Susanne Davis (Davis), who was district administrator for the agency, demurred. On April 30, 1979, Watson filed a first amended complaint again naming the State and Davis, seeking an unspecified sum of damages for lost wages and retirement benefits. Defendants again demurred. On June 6, 1979, the trial court overruled the demurrer but struck Davis as a defendant. Watson filed a second amended complaint on June 20, 1979, naming only the State as a defendant. An answer was filed. Trial was ultimately set for October 17, 1985.

The parties reached a stipulation in the trial court on October 23, 1985, taking the matter off calendar so that Watson could file a second charge with the Department of Fair Employment and Housing (DFEH) and then her third amended complaint. The parties stipulated that Watson could file

---

* Assigned by the Chairperson of the Judicial Council.

a third amended complaint to avoid filing a separate lawsuit seeking damages for the campaign of retaliatory harassment she alleged was initiated by Davis in response to her original DFEP charge and lawsuit. Watson filed her second charge with the DFEH on December 6, 1985, setting forth a number of actions which she asserted to be harassment in retaliation for her original charge of discrimination. She received a "right to sue" letter on January 24, 1986. On January 29, 1986, Watson filed her third amended complaint. She named the State, Davis and two other supervisors, Miye Nitta (Nitta) and Willie Rainey (Rainey) as defendants and alleged six causes of action seeking compensatory and punitive damages. In response, the State moved to strike Davis and Does as defendants and again demurred. On May 7, 1986, the trial court overruled demurrers to the first four causes of action, sustained a demurrer to the cause of action for conspiracy, and granted motions to strike Davis, Nitta and Rainey as defendants, and the claim for punitive damages.

On May 16, 1986, Watson filed her fourth amended complaint alleging four causes of action, including two statutory causes of action for race and age discrimination, a cause of action for breach of the covenant of good faith and fair dealing, and a cause of action for intentional infliction of emotional distress. Watson again named Davis and the two other supervisors as individual defendants, and again sought compensatory and punitive damages as well as injunctive relief. On June 9, 1986, the defendants again demurred and moved to strike. On July 1, 1986, the trial court again overruled the demurrers, and ordered Davis, Nitta and Rainey stricken as defendants, as well as the allegation and prayer seeking punitive damages.

The State filed its answer raising as affirmative defenses claims previously presented by way of demurrer and overruled. On July 31, 1986, plaintiff filed her fifth amended complaint, apparently because the trial court on July 1, 1986, mistakenly instructed Watson to file still another amended complaint rather than ordering the State to answer as it apparently intended.

The State again moved to strike—this time the fifth amended complaint—on August 6, 1986. On October 22, 1986, the trial court struck the fifth amended complaint and allowed the State 30 days to answer. It again filed the same answer it filed previously in response to the fourth amended complaint.

On November 25, 1986, Watson filed her at-issue memorandum listing $1 million in general damages, $25,000 in special damages and $1 million in punitive damages. The matter was set for trial on March 16, 1987. The State agreed to withdraw all objections to the complaint except that based on *Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148 [233 Cal.Rptr.

308, 729 P.2d 743]. At trial various defense motions *in limine* were denied. The State moved for judgment on the pleadings, citing *Cole*. The trial court granted the motion in part, dismissing the emotional distress cause of action but denying dismissal of the good faith and fair dealing cause of action.

After trial, the jury brought in a general verdict in favor of Watson for $1.5 million. The State moved for a new trial on several grounds, including excessive damages. The trial court denied the motion. The State appealed and Watson cross-appealed asserting the trial court erred in striking the individual defendants and the punitive damages allegation and prayer. Subsequently, Watson conditionally abandoned her cross-appeal if the judgment was to be affirmed.

## FACTUAL HISTORY

We state the facts in the light most favorable to the judgment, giving the prevailing party the benefit of every reasonable inference and resolving conflicts in support of the judgment. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) Although the foregoing is elementary black letter law, we reiterate it at the outset of our factual recitation because the State in essence asks that we resolve the considerable evidentiary conflicts in its favor, contrary to our obligation under the law.

Watson is a female of mixed Mexican, Asian and Black ancestry. She was employed by the State as an intake clerk in January 1972. Although she worked in a clerical position, her goal was to become a vocational rehabilitation counselor. Fellow employees considered her a hard worker; her supervisors were satisfied with the quantity and quality of her work; she was polite, compassionate and helpful to clients. Watson was entitled to laterally transfer from her clerical position to the entry level professional position of vocational rehabilitation assistant (VRA) upon passing an examination.

Davis became district administrator for the agency district in which Watson worked in the fall of 1975. Davis announced a promotional oral examination for the VRA position to be held in August 1977. Originally Davis told Watson the examination would be limited only to employees from the district. Subsequently, Davis announced the examination would be open to employees from other districts of the agency, and to nonpermanent employees, such as Laurel Dann (Dann), a Caucasian CETA[1] employee who suffered from a disability.

[1] Comprehensive Employment and Training Act, 29 United States Code, section 801 et seq. (since repealed), a federal government program which funded job training programs to enhance employment opportunities for economically disadvantaged persons.

The procedure for previous similar examinations was to place the examinees on a promotional list based on their performance. They would then be grouped in "ranks" of two or more. Those in the top three ranks would be interviewed again before the final choice was made. This was the "rule of three" required under civil service rules. Davis had told Watson the group of three procedure would be utilized and those in the top three ranks would be further interviewed. The head of the examination group, Barry Hacker, corroborated that such procedure would be followed.

Just before the examination, however, Davis announced she would choose whoever came in first in the examination, bypassing the additional interview process, a virtually unprecedented departure from the normal procedure. During the examination, Davis was observed by Watson and another Black examinee to be coaching Dann. Dann emerged first among the 12 examinees on the promotional list. Watson was rated fifth, but moved to third when two above her withdrew their applications for the position.

The affirmative action program of the agency for any branch under parity for a particular minority group required that a person from that minority group be chosen if such there was in the top three ranks. For a six-month period ending in 1978, Davis's Inglewood branch office was under parity by two Hispanics.

Davis chose Dann for the position. Watson responded by protesting the entire examination process to Davis. She complained to her union, the Clerical and Allied Services Employees Union; she wrote to the administrative services division of the agency. She filed a discrimination complaint with the agency's parent, the Department of Industrial Relations. She filed her discrimination charge with the DFEP.

Several clerical and professional employees working under Davis testified that she favored Whites over non-Whites; that she said the district employed too many Blacks and was serving too many Black clients; that she did not feel that minorities had the intelligence and the skills to be professionals, managers, or supervisors.

After protesting the failure to promote her, Watson was subjected to a campaign of retaliatory harassment by Davis and Watson's supervisors who were under her control, Nitta and Rainey. Rainey, too, was Black.

In June 1979, Davis announced another VRA examination for which Watson was qualified. Watson requested of Davis that she be considered for the position and formally applied for it in July 1979. Shortly thereafter, it

was announced that the examination was for vocational rehabilitation trainee (VRT), for which position Watson did not qualify. By 1981 it was no longer necessary to take an examination for lateral transfer from a clerical position to the VRA position. Requests by Watson to Davis over a period of years for such lateral transfer to a VRA position in other districts were ignored; on one such occasion, Davis told Watson that minorities rarely made good professionals. During these years, open positions for VRA's existed.

On January 6, 1978, Davis told Watson to withdraw her discrimination complaints from the Department of Industrial Relations and her union; Watson refused and was downgraded from intake clerk to switchboard receptionist, although her civil service rating and salary remained the same. On January 25, 1978, a public announcement was made that Watson had been transferred from Inglewood to another office in the district. Watson had not requested the transfer and fought it through her union. The transfer was cancelled.

Beginning in January 1978, Watson was ordered by her supervisor to keep time sheets of her work activities in 15 minute increments; she was prohibited from making personal calls from her office telephone and instructed to use a public telephone which required that she leave her office building. No other employee was subjected to similar requirements and restrictions. In May 1978, within days of notification to the agency that Watson's charge had been filed with the DFEP, Davis told Watson that she would discriminate against her as long as she wanted.

Davis had a partition placed behind Watson's desk separating her from other clerical employees and told her she would remain isolated until she resigned. Davis told other staff not to associate with Watson, advising her such isolation would cease when Watson withdrew her lawsuit. During September and October 1978, Watson requested of Davis consideration for a vocational rehabilitation counseling position in the Inglewood district; Davis responded that Watson would never receive a position in Inglewood and that she belonged on the "east side" of Los Angeles, in a branch that was primarily Hispanic, because Davis believed Watson was Hispanic. Watson stated she also was part Black; Davis called her a "nigger," and then said she was neither Black nor White, but "a zebra."

Watson had been attending college, first at West Los Angeles College, then at California State University, Los Angeles, taking courses in a vocational rehabilitation counselor training program. While she attended classes primarily on her own time, she was allowed time off with pay for class and travel time, and was permitted to work on a variable schedule, under an

agency "off-site college program." A requirement of the program was completion of a student internship in an appropriate agency. Davis refused her such an internship in the Inglewood district. Watson was also refused internships at other agencies although she did complete an internship with the Corrections Department. In November 1979, Davis eliminated Watson's paid travel time to college, telling her this was a consequence of Watson's lawsuit.

In early 1981, Nitta, Watson's immediate supervisor, told her that Davis would eliminate her from the off-site college program unless Watson dropped her lawsuit before Davis was to be deposed. Davis also told this to Watson. Shortly before Davis was to be deposed, a memo was issued by John Littlefield, of the agency's staff development section, limiting participation in the off-site college program only to students with 18 units or less, and stating the agency administrative manual would soon be revised to so indicate. The manual was never amended to incorporate the 18-unit limit. By then Watson had nearly completed the 120 units required for a degree. Davis terminated Watson's participation in the off-site college program upon receipt of the memo. Watson was unable to complete her studies leading to a degree, which degree would qualify her for the VRA position without having to pass a VRA examination controlled by Davis.

Watson suffered an emotional breakdown in September 1981 and was intermittently disabled from work because of illness through January 1982. Davis charged Watson with being absent without leave (AWOL) from January 11 through January 15, 1982, notwithstanding that administrative requirements for determining AWOL status were not met. Watson was terminated on January 11, 1982, and did not return to work until August 1982. She appealed her termination and was ordered reinstated without backpay in March 1982 by the State Personnel Board. After her reinstatement, Davis telephoned Watson at home and told her she would again be fired but would not again be reinstated.

When she returned to work, at the Culver City branch office, Watson's supervisor there, Rainey, informed her she could not have the variable work schedule she needed in order to enroll again in the off-site college program. Non-Hispanic receptionist and clerical employees did have variable work schedules at this time. On March 13, 1985, Watson was once again isolated in the reception area; the desks of the remaining clerical employees were moved to the rear of the floor. Rainey told the other clerical employees, pursuant to instructions from Davis, that they were not to help Watson with her work.

Watson was not presented with a gift and card upon her return for which Rainey had collected donations from fellow employees. Rainey forgot to

obtain them and returned the money to the donors. Shortly thereafter, Watson was not permitted to attend an employee-sponsored picnic in her honor.

Once each year supervisors and employees would decide upon performance objectives and the methods for achieving those objectives. This process resulted in the adoption for each employee of an individual development plan (IDP). Between 1978 and 1985, Watson proposed in her IDP the goal of becoming first a VRA and then a vocational rehabilitation counselor. Davis always rejected Watson's proposals. Rainey told Watson she was wasting her time and should resign. Rainey harassed Watson at Davis's behest.

Watson had symptoms of an emotional breakdown during a number of months in 1981. She complained of headaches, chest pains, loss of appetite, memory loss, loss of sexual drive; she had nightmares; she awakened screaming every night; she heard voices. Watson attempted suicide when her college program was terminated and on two other occasions shortly thereafter.

Dr. Paul Barkopolous, a psychiatrist, examined Watson in 1987 and diagnosed her as suffering from a severe psychiatric disorder which had grown progressively worse since 1981, characterized as a major depressive disorder with psychotic features. He predicted that Watson would in the future require intensive medical treatment, including medication and possibly hospitalization. He attributed her emotional and psychological problems and her somatic complaints to stresses experienced as a result of the refusal to promote her to a counselling position. She could not remain in a stressful environment.

George Brinton, an economist testifying on Watson's behalf, estimated past and future loss of earnings and retirement benefits at a maximum of $383,574, which she would have earned had she become first a VRA and then a vocational rehabilitation counselor and remained at work until retirement at age 70.

## I.

### BACKGROUND

"The California Fair Employment Practice Act (FEPA) was enacted in 1959 (former Lab. Code, § 1410 et seq.; see Stats. 1959, ch. 121, § 1, pp. 1999-2005) and recodified in 1980 as part of the FEHA (Stats. 1980, ch. 992, § 4, p. 3140 et seq.). 'The law establishes that freedom from job

discrimination on specified grounds, . . . is a civil right. ([Gov. Code] § 12921.) It declares that such discrimination is against public policy (§ 12920) and an unlawful employment practice (§ 12940). [Fn. omitted.]' (*Commodore Home [Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 213 (185 Cal.Rptr. 270, 649 P.2d 912)].) The statute creates two administrative bodies: the Department of Fair Employment and Housing (the department) (§ 12901), whose function is to investigate, conciliate, and seek redress of claimed discrimination (§ 12930), and the commission, which performs adjudicatory and rulemaking functions (§ 12935; see also § 12930). An aggrieved person may file a complaint with the department (§ 12960), which must promptly investigate (§ 12963). If the department deems a claim valid it seeks to resolve the matter—in confidence—by conference, conciliation, and persuasion. (§ 12963.7.) If that fails or seems inappropriate, the department may issue an accusation to be heard by the commission. (§§ 12965, subd. (a), 12969.) The department acts as prosecutor on the accusation and argues the complainant's case before the commission. (*State Personnel Bd.* v. *Fair Employment & Housing Com.* (1985) 39 Cal.3d 422, 428 [217 Cal.Rptr. 16, 703 P.2d 354]; *Commodore Home, supra,* 32 Cal.3d at p. 213.)

"If an accusation is not issued within 150 days after the filing of the complaint or if the department earlier determines not to prosecute the case and the matter is not otherwise resolved, the department must give the complainant a 'right to sue' letter. The complainant may then bring a civil suit in superior court. (§ 12965, subd. (b); see *Commodore Home, supra,* 32 Cal.3d at pp. 213-214.)" (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1383-1384 [241 Cal.Rptr. 67, 743 P.2d 1323].)

## II.

### EXHAUSTION OF REMEDIES

■ We fail to understand why the State continues to urge on appeal as it did in the trial court that Watson may not prevail because she has not exhausted her civil service administrative remedies. She need not have done so as the State well knows because Watson had a choice between her civil service remedies and those provided by The Fair Employment and Housing Act. (Gov. Code, § 12940 et seq.; *State Personnel Bd.* v. *Fair Employment Housing Com.* (1985) 39 Cal.3d 422, 429, 431 [217 Cal.Rptr. 16, 703 P.2d 354].) She chose to file her first charge with the DFEP and proceed accordingly. Watson complied with the procedures required under the act, received her "right to sue" letter and timely filed her suit. (*Commodore Home Systems, Inc.* v. *Superior Court, supra,* (1982) 32 Cal.3d at pp. 213-214,

217.) Because the State Attorney General knows the law in this area, we can only regard the argument as frivolous.

## III.

### GOVERNMENTAL IMMUNITY

■ The State asserts with similar lack of authority that the broad tort immunity provided the state by Government Code section 815 bars Watson's action. The State argues that much of what government does is beyond the court's jurisdiction. Unfortunately for the State, acts of supervisorial employees ostensibly directed at other employees in the normal course of the employment relationship, motivated by and resulting in discrimination based on race and age, are not so insulated. (*State Personnel Bd.* v. *Fair Employment and Housing Com., supra,* 39 Cal.3d at p. 431.)

## IV.

### WORKER'S COMPENSATION

■ This same analysis is applicable to the state's contention that worker's compensation provides the exclusive remedy for any injury Watson suffered on the job. The trial court agreed and dismissed the fourth cause of action for intentional infliction of emotional distress, based on the holding in *Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148 [233 Cal.Rptr. 308, 729 P.2d 743]. We note that notwithstanding its action dismissing the emotional distress cause of action, the trial court nonetheless instructed the jury, in the form of BAJI instructions Nos. 12.72, 14.00, 14.13,[2] and that pain and suffering and emotional distress constituted

---

[2] The text of the instructions given is as follows:

BAJI No. 12.72: "Emotional Distress—Defined. The term 'emotional distress' means mental distress, mental suffering or mental anguish. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment and worry."

BAJI No. 14.00: "Compensatory Damages—Personal Injury and Property Damage—Introductory. If, under the court's instructions, you find that plaintiff is entitled to a verdict against defendant, you must then award plaintiff damages in an amount that will reasonably compensate her for each of the following elements of claimed [loss] [or] [harm], provided that you find that such harm or loss was [or will be] suffered by her and caused by the act or omission upon which you base your finding of liability. [¶] The term economic damages means monetary losses including medical expenses, loss of earnings, loss of employment and loss of business or employment opportunities. [¶] The term non-economic damages means non-monetary losses including, but not limited to pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, humiliation and in-

elements of damages arising out of plaintiff's statutory race and age discrimination causes of action and her breach of the covenant of good faith and fair dealing cause of action.

The record shows that Watson suffered severe emotional and psychological illness manifested by both psychological and physical symptoms and the loss of considerable time from work. We conclude Watson suffered physical injury and disability arising out of emotional distress so as to remove this case from the ambit of *Renteria* v. *County of Orange* (1978) 82 Cal.App.3d 833, 838-842 [147 Cal.Rptr. 447]. However, we find unpersuasive the State's argument that we should depart from our holding in *Jones* v. *Los Angeles Community Colleges Dist.* (1988) 198 Cal.App.3d 794 [244 Cal.Rptr. 37], and find this case to be governed by *Cole* and *Shoemaker* v. *Meyers* (1987) 217 Cal.App.3d 475, review granted Aug. 26, 1987 (S001726) [237 Cal.Rptr. 686]. The Supreme Court in *Cole* stated that even intentional acts of misconduct by an employer causing disability are within the exclusive province of worker's compensation so long as the misconduct is due to actions which are a normal part of the employment relationship, such as demotions, promotions, criticisms of work practices, and frictions in grievance negotiations. (*Cole* v. *Fair Oaks Fire Protection Dist., supra,* 43 Cal.3d at p. 160.)

Other than to say that a plaintiff need merely allege some form of proscribed discrimination to avoid the holding of *Cole,* the State presents no argument, cogent or otherwise, as to why this court should depart from its holding in *Jones,* that *Cole* "has no application to the instant case where the claims are based on causes of action created by statute, The Fair Employment and Housing Act. (Gov. Code, § 12900 et seq.)" (*Jones* v. *Los Angeles Community College Dist., supra,* 198 Cal.App.3d at p. 807.) Indeed, the facts of this case are sufficiently similar to those of *Jones* that application of the rationale of its holding is inescapable. "[T]he application of the exclusivity provision of the Labor Code would in effect result in no recognition of or

jury to reputation. [¶] The amount of such award [including economic and non-economic damages] shall include:"

BAJI No. 14.13: "Measure of Damages—Personal Injury—Pain and Suffering. Reasonable compensation for any pain, discomfort, fears, anxiety and other mental and emotional distress suffered by the plaintiff and of which his injury was a [proximate] cause [and for similar suffering reasonably certain to be experienced in the future from the same cause.] [¶] No definite standard [or method of calculation] is prescribed by law by which to fix reasonable compensation for pain and suffering. Nor is the opinion of any witness required as to the amount of such reasonable compensation. [Furthermore, the argument of counsel as to the amount of damages is not evidence of reasonable compensation.] In making an award for pain and suffering you shall exercise your authority with calm and reasonable judgment and the damages you fix shall be just and reasonable in the light of the evidence. [¶] [This is non-economic damage.]"

compensation for the humiliation and other injuries which Jones suffered . . . . A failure to recognize a cause of action under such circumstances also furthers a policy in *favor* of discrimination in the workplace. Because two separate wrongs are involved, there are no election of remedies or double recovery problems." (*Id.,* at p. 809.)

Moreover, when we examine *Cole,* we note, as *Jones* emphasizes, that issues of legislative policy and intent in this area were not addressed. Among cases which the Supreme Court noted permitted tort recovery were those involving conduct in which the employer stepped out of its proper role. (43 Cal.3d at p. 161.)

Unlike *Cole* and *Shoemaker,* the allegations and evidence in this case do not involve conduct which can be expected normally to occur in the workplace and which is part of the employment risk. Prohibited racial and age discrimination are against the law and policy of this state. Such discrimination is not a normal incident of employment, no less for an employee of the state than for one employed in the private sector.

We therefore conclude that Watson is not limited to worker's compensation for her injuries, but may seek and recover such damages (Civ. Code, §§ 3294, 3333) as are available for these statutory causes of action. ■ Our Supreme Court has held "that, in a civil action under the FEHA, all relief generally available in noncontractual actions, including punitive damages, may be obtained." (*Commodore Home Systems, Inc.* v. *Superior Court, supra,* 32 Cal.3d at p. 221.)

## V.

### The Covenant of Good Faith and Fair Dealing

We next consider the state's contention that no cause of action is stated for breach of the covenant of good faith and fair dealing. We agree. ■ Employment in state civil service is governed by statute, not by contract. (*Boren* v. *State Personnel Board* (1951) 37 Cal.2d 634 [234 P.2d 981]; *Miller* v. *State* (1977) 18 Cal.3d 808; *Valenzuela* v. *State of California* (1987) 194 Cal.App.3d 916 [240 Cal.Rptr. 45].) While "the State civil service system requires good faith and fair dealing in the resolution of the inevitable conflicts inherent in the employment relationship" (*Valenzuela, supra,* at p. 920), it is that system which provides remedies for resolution of grievances and redress of wrongs. (*Id.,* at p. 920.) "An aggrieved civil service employee must use all agency administrative procedures, including available appellate review, before otherwise resorting to the courts. [Citations.]" (*Id.,* at p. 920.) The obligation of the State to deal fairly and in good

faith with its employees is restated in the employee's claim for breach of the implied covenant of good faith and fair dealing. "[R]emedies for breach of that obligation are [exclusively] in the administrative procedures provided by the State civil service system . . . ." (*Id.,* at p. 922.)

Watson chose not to avail herself of the remedies available through the state civil service system; she chose instead to proceed first through the DFEP and DFEH, and then through the courts. While she may so proceed with respect to her statutory claims and causes of action, she may not avail herself of a remedy which provides damages for breach of the covenant of good faith and fair dealing. The trial court erred in failing to dismiss this cause of action. Because of our resolution of this issue, we need not discuss the state's contention that Watson's claim filed with the Board of Control was untimely.

## VI.

### FAIRNESS OF THE TRIAL

■ We also reject the claim that the trial was unfair because the State was not permitted to have Davis present throughout the trial as "an officer or employee designated by its attorney" pursuant to Evidence Code section 777, subdivision (b). While Davis may have been the person most knowledgeable about the case, because she had retired some months before the commencement of trial she did not qualify under the statute. By not designating a qualified person, the State waived its right to have an officer or employee present.

■ The State claims that it suffered prejudice because Watson and her witnesses testified about examples of harassing conduct beyond those contained in her charge to the DFEH. The contention is without merit. The charge provides the basis for the DFEH to investigate the aggrieved employee's claims of discrimination. It is not intended as a limiting device. (*Baker* v. *Children's Hospital Medical Center* (1989) 209 Cal.App.3d 1057, 1064-1065 [257 Cal.Rptr. 768]; *Jones* v. *Los Angeles Community College Dist., supra,* 198 Cal.App.3d at p. 810; *Marshall* v. *Fair Employment Practice Com.* (1971) 21 Cal.App.3d 680, 684 [98 Cal.Rptr. 698].) Once Watson filed her lawsuit, nothing prevented the State from requiring Watson, through discovery, to identify and describe each act of harassment. Moreover, it is too late to raise on appeal an issue not raised at trial. Any claim of error is waived. (*Royster* v. *Montaneza* (1982) 134 Cal.App.3d 362, 367 [184 Cal.Rptr. 560].)

## VII.

### SUFFICIENCY OF THE EVIDENCE

We turn to the evidence in this case to determine whether it supports the judgment. We shall treat in this part of our opinion issues ancillary to sufficiency of the evidence.

■ It is fundamental that the trial court's factual findings will be reversed on appeal only when they are not supported by substantial evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479]; *Stevens* v. *Parke, Davis & Co.* (1975) 9 Cal.3d 51, 64 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059].) In applying the substantial evidence test, the court views the evidence in the light most favorable to respondent (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920 [101 Cal.Rptr. 568, 496 P.2d 480]), accepting as true respondent's evidence, resolving all conflicts in respondent's favor, and drawing such favorable inferences as may be drawn from the evidence. (*Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530, 544 [138 Cal.Rptr. 705, 564 P.2d 857, 99 A.L.R.3d 158].)

### A. *Standard of Proof*

■ At the threshold of its argument that the verdict was not supported by substantial evidence, the State argues that plaintiff failed to meet the appropriate standard of proof, as established by the Supreme Court for title VII cases.[3] (*McDonnell Douglas Corp.* v. *Green* (1973) 411 U.S. 792, 800 [36 L.Ed.2d 668, 676-677, 93 S.Ct. 1817].)[4] The State then proceeds to recite only evidence favorable to the defendant, without so much as a nod in the direction of the substantial evidence test. In fact the *McDonnell Douglas* test was applied in the trial court[5] and Watson presented sufficient evidence to show she meets its requirements.

---

[3] Civil Rights Act of 1964, 42 United States Code section § 2000 et seq.

[4] "(1) The complainant must establish a prima facie case of discrimination; (2) the employer must offer a legitimate reason for his actions; (3) the complainant must prove that this reason was a pretext to mask an illegal motive." (*Mixon* v. *Fair Employment & Housing Com.* (1987) 192 Cal.App.3d 1306, 1317 [237 Cal.Rptr. 884].)

[5] The trial court instructed the jury as follows: "If you find that plaintiff has proved that there was retaliation, or age discrimination, or discrimination based on race or national original, then you must decide whether the defendants have given a non-retaliatory and non-discriminatory explanation for its treatment of plaintiff.

"If you find defendants have given such an explanation for retaliation, age discrimination and race or national origin discrimination then you must decide whether plaintiff has proved by a preponderance of the evidence that the reason [*sic*] given by defendants were not the true reasons for their actions, i.e., that they were excuses for the retaliation."

We observe, however, that its applicability is unsettled. The FEHC for many years applied a version of that test. (See *Ibarbia* v. *Regents of University of California* (1987) 191 Cal.App.3d 1318 [237 Cal.Rptr. 92].) However, it has recently rejected that test, and has in its place adopted as a standard that the sole inquiry in each case is whether a preponderance of all the evidence demonstrates that the adverse employment action was caused at least in part by a discriminatory motive. (*DFEH* v. *Church's Fried Chicken, Inc.* (1987) FEHC Dec. No. 87-18, at p. 17.) Indeed, the United States Supreme Court has held that after the close of a full trial, the court "has before it all the evidence it needs" to decide the ultimate issue—whether plaintiff has been the victim of intentional discrimination—and should therefore proceed to it "directly just as district courts decide disputed questions of fact in other civil litigation." (*U.S. Postal Service Bd. of Govs.* v. *Aikens* (1983) 460 U.S. 711, 715-716 [75 L.Ed.2d 403, 410, 103 S.Ct. 1478].) That is the posture of the instant case. Moreover, plaintiff's burden is not to prove that "racial animus was the sole motivation behind the challenged action, he must prove by a preponderance of the evidence that there was a 'causal connection' between the employee's protected status and the adverse employment decision." (*Mixon* v. *Fair Employment & Housing Com., supra,* 192 Cal.App.3d at p. 1319.) The trier of fact is to decide whether it believes the employee's contentions about or the employer's explanations of its actions. (*Ibid.*) As we make clear in our examination of the sufficiency of the evidence, Watson has fulfilled these requirements. The trial court applied the correct standard of proof.

### B. *Statute of Limitations*

■ In connection with Watson's allegations of harassment, the State asserts that those acts occurring more than one year prior to filing of plaintiff's second charge with DFEH, in December 1985, are barred by the one year statute of limitations provided by Government Code section 12960. We disagree. Watson has recited a plethora of actions and conduct commencing from the time she filed her first charge in 1978 and extending to the time of her second charge during which Watson suffered harassment predicated upon a retaliatory motive, in violation of Government Code section 12940, subdivisions (h) and (i). We find this course of conduct meets the requirements of the doctrine of "continuing violations."

This doctrine has been "developed in cases examining the timeliness of complaints filed with the Equal Employment Opportunity Commission to establish a violation of Title VII of the Federal Civil Rights Act of 1964. (see 42 U.S.C.A. § 2000 et seq.) As most recently explained in *Williams* v. *Owens-Illinois, Inc.* (9th Cir. 1982) 665 F.2d 918, cert. den., 459 U.S. 971 [74 L.Ed.2d 283, 103 S.Ct. 302], 'the relevant strain of continuing violation

doctrine is that a systematic policy of discrimination is actionable even if some or all of the events evidencing its inception occurred prior to the limitations period.' [Citations.] We find these federal decisions reflect the same interests implicated in the instant controversy and agree the doctrine of continuing violations is relevant to the resolution of the instant matter." (*City and County of San Francisco* v. *Fair Employment & Housing Com.* (1987) 191 Cal.App.3d 976, 983 [236 Cal.Rptr. 716].) Because of the continuing course of harassing conduct occurring over so many years we conclude plaintiff's second charge was timely filed.

### C. *Invalidity of the Charge*

The State also argues the charge is "invalid," but a review of its argument demonstrates it is the sufficiency of the evidence to support the charge about which the State complains.

### D. *Substantial Evidence*

Having disposed of the State's preliminary contentions, we turn finally to its primary claim that the judgment is not supported by substantial evidence in the record.

■ The evidence is in sharp conflict, with witnesses testifying for the opposing sides presenting diametrically opposing versions of the events and circumstances in the case and the motivation of the actors. It is for the trier of fact to choose which version to believe; the jury chose to credit plaintiff and her witnesses and to disbelieve those witnesses testifying in behalf of the State. That is the jury's function. This court may not substitute its judgment about the credibility of witnesses. (*Crawford* v. *Southern Pacific Co., supra,* 3 Cal.2d at p. 429.) We may only examine the evidence to determine if it meets the test of substantiality—that is, that it is reasonably credible, of solid value and of ponderable legal significance. (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54].)

■ We conclude that Watson presented substantial evidence supporting her allegations of discrimination both in the August 1977 promotional examination for VRA and the subsequent harassment and discrimination carried out in retaliation for Watson's protest of the original refusal to promote her.

The jury returned a general verdict. ■ "Where there are *several counts* or causes of action, a general verdict will stand if the evidence supports it on any one sufficient count." (7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 331, p. 332; *Gillespie* v. *Rawlings* (1957) 49 Cal.2d 359, 369

[317 P.2d 601].) Evidence in support of the statutory causes of action is sufficient to support the verdict even in the absence of the breach of the covenant of good faith and fair dealing cause of action.

Watson and witnesses testifying on her behalf presented evidence that she was a member of a protected class, in that she was of Black, Mexican and Asian ancestry. She qualified for the promotion. She had completed over 80 units of college work in a vocational rehabilitation program with a B average. She was a permanent employee with the agency. She had performed hundreds of hours of volunteer work with disabled people.

In the examination, she placed number 5, and was later elevated to number 3 when two of those above her on the list waived the promotional opportunity. Thus she was within the first three ranks required for the successful applicant. Davis, the district administrator who decided who would be promoted, discriminated against Watson by violating established procedures for appointing vocational rehabilitation assistants both during and after the examination. Davis was observed during the examination to be coaching a Caucasian woman applicant, Dann. None of the other applicants, including Watson, was coached either before or during the examination. Dann had the highest score and was granted the promotion; however, required further interviews of those in the first three ranks were not conducted. Moreover, affirmative action program requirements were ignored.

On many occasions Watson requested that Davis permit her to transfer to another district to become a VRA. Davis refused, telling Watson that minorities rarely make good professionals. Davis told Watson she would never receive a promotion to VRA at the Inglewood branch. Believing Watson was Hispanic, Davis told her she belonged on the east side. When Davis was told Watson was part Black, she called her a "nigger."

Watson protested the refusal to promote her to Davis directly, to her union, and to various levels of administration in the agency; she filed a charge with the DFEP, received a "right to sue" letter from the agency and thereafter filed her lawsuit.

For eight years after Watson first protested the refusal to promote her, Davis directly and through others harassed and discriminated against her. She continually rejected Watson's requests for lateral transfer to the VRA position in the same or other districts; isolated Watson physically from her fellow employees; instructed her immediate clerical supervisor, Rainey, to treat Watson badly, which treatment included yelling at her, telling Watson her days were numbered and lying about the quality of her work, and personally demeaned and belittled her.

As a result, Watson suffered humiliation, anxiety and a myriad of physical and psychological complaints resulting in her taking many months off work and evidencing severe emotional distress. Watson's expert psychiatric witness diagnosed her as suffering from a severe depression disorder, requiring medication, constant care, perhaps including hospitalization and shock therapy; she was and would continue to be unable to work; her illness and disability were caused by harassment and discriminatory treatment at work.

The State asserts evidence in support of Watson's case lacked substantiality, claiming that her testimony was inherently improbable both objectively and because of the very psychiatric and emotional symptoms and disabilities caused by her mistreatment. Unfortunately for the State, Watson's testimony was corroborated by a number of witnesses in both the professional and clerical ranks. Such testimony supported Watson's claims as to her capability and qualifications for the promotion as well as Davis's animus toward her and members of minority racial and ethnic groups.

Moreover, in order for evidence to be deemed "inherently improbable" so as to be disregarded, it must be physically impossible or obviously false without resorting to inference or deduction. Such is not the case. (*Estate of Reed* (1955) 132 Cal.App.2d 732 [282 P.2d 935].) The State is merely arguing the jury should not have believed Watson and her witnesses; rather it should have believed the State's witnesses. That is not an argument which may be made on appeal; the State's contention must be rejected.

## VIII.

### DAMAGES AWARD

We conclude by considering the State's contention that damages are too high.

"A reviewing court must uphold an award of damages whenever possible [citations] and all presumptions are in favor of the judgment [citations]." (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 61 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) With respect to a claim that compensatory damages are excessive, "[w]e have recognized that while the jury is entrusted with vast discretion in determining the amount of damages to be awarded, ' ". . . where the recovery is so grossly disproportionate as to raise a presumption that it is a result of passion or prejudice, the duty is then imposed upon the reviewing court to act." ' [Citations.]" (*Id.,* at p. 64.)

This case involves consideration by the trial court of the issue of excessive damages in its determination of defendants' new trial motion, which was denied. ■■■ "[A]lthough the trial court's determination is not binding upon a reviewing court, it is to be accorded great weight because having been present at the trial, the trial judge was necessarily more familiar with the evidence. [Citations.]" (*Ibid.*)

■■■ Scrutinizing the facts of this case in light of the foregoing principles, we conclude that the damages awarded are not excessive in view of the substantial and severe harm Watson suffered. The economist testifying for Watson estimated her past and future lost earnings together with interest until the projected date of her retirement had a value as high as $383,000. It is therefore evident that the damages award contemplates in addition compensation for the severe emotional distress suffered by plaintiff for so many years coupled with her disability from work generally and from working in an area which she found so emotionally rewarding. That the award in the instant case may be larger than in similar cases does not provide as a matter of law a basis for overturning it. (*Daggett* v. *Atchison, T. & S. F. Ry. Co.* (1957) 48 Cal.2d 655, 666 [313 P.2d 557, 64 A.L.R.2d 1283].) We cannot conclude that the value placed by the jury on both economic loss and general damages is so disproportionate to the harm suffered as to raise a presumption of passion or prejudice affecting the result.

CROSS-APPEAL

Watson's cross-appeal is dismissed at her request pursuant to California Rules of Court, rule 19(b).

We affirm the judgment of the trial court on the statutory causes of action and reverse on the cause of action for breach of the covenant of good faith and fair dealing.

The case is remanded to the trial court for determination of attorney's fees on appeal.

Costs to respondent.

Johnson, J., concurred.

**LILLIE, P. J.,** Concurring and Dissenting.—I concur in the majority opinion except for part VIII in which the award of damages is upheld. From this I respectfully dissent.

While a reviewing court must uphold an award of damages whenever possible (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 61 [118

Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]), " '[w]hen the award as a matter of law appears excessive, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice, the duty is then imposed upon the reviewing court to act.' [Citation.]" (*Cunningham* v. *Simpson* (1969) 1 Cal.3d 301, 308-309 [81 Cal.Rptr. 855, 461 P.2d 39].) "There is no precise mechanical rule by which an appellate court can measure a personal injury award to determine if it is a just and fair one or is excessive. As the court remarked in *Daggett* [v. *Atchison, T. & S. F. Ry. Co.* (1957) 48 Cal.2d 655 (313 P.2d 557, 64 A.L.R.2d 1283)], *supra,* each case must be determined on its own peculiar facts and circumstances. This simply means that we must look to the record to see if there is evidence to support the jury's verdict, whatever the amount of the verdict may be." (*Henninger* v. *Southern Pacific Co.* (1967) 250 Cal.App.2d 872, 883 [59 Cal.Rptr. 76].) "[W]hether it is so great as to shock the conscience of appellate judges and necessarily implies passion and prejudice on the part of the jury depends upon the nature and extent of the victim's injuries, his pain, suffering and humiliation, and the amount of special damages that may have been incorporated in the total award." (*Id.,* at pp. 882-883.)

Plaintiff's past and future lost earnings, plus prejudgment interest on past earnings, amounted to a maximum of $383,574. Reasonable charges for medical services rendered to plaintiff were estimated to be $14,410. Plaintiff's economic damages thus totaled $398,000 in round figures. Deducting that sum from the award of $1.5 million leaves us with $1,102,000 attributable to noneconomic items of damage. As to those items the evidence showed: Because of the stress in plaintiff's work environment she contracted a severe psychotic disorder which had grown progressively worse since 1981 so that at the time of trial (1987) she suffered from "a major depressive disorder with psychotic features." Her chief physical complaint was headaches; she also complained of nausea, loss of sleep, loss of appetite, difficulty in swallowing, choking feelings, chest pains, heart flutter, gastrointestinal problems and dizziness. While plaintiff's medical expert testified that such physical symptoms are "consistent with the kind of vague complaints that people have who are under some kind of stress," they are relatively trivial complaints some of which are commonly experienced by many people. Further, there was no expert testimony that plaintiff's physical complaints or her psychotic disorder are permanent. It is true that plaintiff also was subjected to harassment and discrimination by defendant for a period of eight years. Nevertheless, it is my view on this record that compensation of $1,102,000 for pain, discomfort, fear, anxiety and other mental and emotional distress is excessive as a matter of law. The size of the verdict attributable to noneconomic factors strongly suggests that the jury improperly determined to punish defendant for its treatment of plaintiff.

While the jury is given wide discretion in determining the amount of damages to be awarded (*Bertero* v. *National General Corp., supra,* 13 Cal.3d 43, 64), its award must be supported by the evidence. The award of over $1 million for noneconomic damages lacks support. It is "so excessive as to indicate that it was prompted by passion, prejudice, whim, or caprice." (*Seffert* v. *Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 509 [15 Cal.Rptr. 161, 364 P.2d 337] (dis. opn. of Traynor, J.), fn. omitted.)

I would reverse that portion of the judgment ordering that plaintiff recover the sum of $1.5 million from defendant, with directions that the trial court retry the issue of damages.

The petition of appellant Department of Rehabilitation for review by the Supreme Court was denied November 2, 1989.