[No. B151505. Second Dist., Div. Seven. Oct. 29, 2002.]

STREETSCENES L.L.C. et al., Plaintiffs and Respondents, v. ITC ENTERTAINMENT GROUP, INC., et al., Defendants and Appellants.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, II and III.

236

COUNSEL

Munger, Tolles & Olson, Glenn D. Pomerantz, Mark H. Epstein, Allison B. Stein; Glickfeld & Fields and Craig M. Fields for Defendants and Appellants.

Fox & Spillane, Gerard P. Fox and Monica Balderrama for Plaintiffs and Respondents.

OPINION

MUNOZ, J.*—A movie production company hires an executive to look for projects, with the movie production company having the right of "first refusal" as to any projects the executive finds. The producer is housed in the movie production offices and has all of the trappings of an executive producer of the company. When the producer finds investors for a movie, he promises millions in profits and then proceeds to fraudulently convert over $1 million from those investors.

At trial, the movie production company disavows the executive producer's actions and claims he was an independent producer. The jury finds he was an agent and awards damages for moneys invested and lost in addition to lost profits and punitive damages. On this appeal the fraud of the producer is not disputed, but agency and lost profits are.

We reverse that portion of the judgment awarding damages for lost profits and remand for a new hearing on the issue of the amount of punitive damages.

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

FACTS

The appellants in this action are ITC Entertainment Group, Inc., ITC Entertainment Group Ltd. and ITC Distribution, Inc. (ITC). Respondents are StreetScenes L.L.C. and CrewCast L.L.C. (respondents).[1] The principals of StreetScenes and CrewCast are Martin Chernoff (Chernoff), Neil Feinstein (Feinstein) and Ron Hunt (Hunt). The other party to this action was L. Travis Clark (Clark). A default judgment was obtained as to Clark. In May 1995, Clark was hired by ITC to share, create ideas and develop projects. Clark was brought aboard at ITC by ITC's president, Jules Haimovitz who had previously worked with Clark at Spelling Entertainment.

Hunt, Feinstein and Chernoff had been business partners for over 20 years. Feinstein had financed a low-budget film in the past, but in that case he had been a passive investor. Hunt had written a screenplay entitled Wrong Decision, which was based upon his experiences as a manager and then owner of a nightclub. Hunt recalled having met Clark and recalled Clark was somehow involved in the movie industry. Hunt decided to submit his script to Clark who Hunt knew was now at ITC. After Clark read the script, Hunt and Clark talked. Clark then told Hunt the script had "serious" potential and that ITC was interested in making a movie for distribution.

Clark represented himself to be an executive producer at ITC and stated that ITC would produce and distribute the movie. Clark also faxed to respondents, on ITC's fax machine, with an ITC cover sheet, his resume and biographical information. The resume specified Clark had completed a motion picture and was an executive producer at ITC/Polygram Film Entertainment.

In July 1995, Clark flew to Washington, D.C. at Hunt's expense to meet with Hunt and Keith Rosenburg (Rosenburg), who was respondents' transactional attorney. At the meeting in Rosenburg's office, Clark claimed he was an executive producer for ITC and, through his position at ITC, he was to produce the film which ITC would distribute.

Clark represented the film would focus on the African-American market and should do very well in video and cable. Clark also told others, at a lunch meeting, that he was an "executive producer with a very large Hollywood Company called ITC" and that ITC had deep-seated connections in the distribution of movies, especially in the inner cities. He further explained that with ITC's extensive distribution systems and a sound track with ITC/Polygram recording artists, the low-budget movie should make a profit of $10 to $12 million.

---

[1] Respondents' motion to strike portions of appellants' reply brief is denied.

In a letter, on ITC Distribution letterhead, dated July 21, 1995, Clark "confirmed ITC's agreement for guaranteed distribution for the intended film presently entitled Wrong Decision." Clark also wrote, "ITC and I are looking forward to distributing this project." ITC, through Clark, then guaranteed two additional projects for plaintiffs following the completion of Wrong Decision.

On or about July 26, 1995, Clark sent Rosenburg a letter on ITC Distribution letterhead along with ITC's detailed financial projections for the movie. The projections were also on ITC Distribution letterhead and were sent from ITC's fax machine. The projections were in part based upon industry publications and estimates from ITC people. Projections of this type were normally provided by ITC's chief operating officer, Mike Novelly.[2]

The projections were detailed and included home video revenues of between $250,000 to $500,000, pay-per-view of between $150,000 to $300,000, cable revenue of between $125,000 to $700,000, and basic cable of between $100,000 to $300,000. Syndication was estimated at being between $250,000 to $400,000, and foreign theatrical revenue was estimated at between $150,000 to $300,000.

Clark further represented the film would be a theatrical release, with ITC's calculated theater revenue of between $10 million to $15 million. Clark further promised he would complete the film for approximately $550,000.

ITC provided Clark with all of the accoutrements of an ITC executive. He was housed in an executive office on the same floor as ITC's president, vice-president, general counsel and other senior executives. Additionally, ITC provided Clark with ITC letterhead, fax cover sheets, use of ITC's telephone, fax machines, mail room and other resources for the purpose of completing projects for ITC. Also, Clark was provided embossed business cards with the ITC logo, identifying him as an executive producer for ITC. These were displayed prominently on Clark's desk. One visiting Clark at the ITC offices would come away with the impression that Clark was a very heavy hitter at ITC.

There were other independent production companies, such as American Zoetrope, located in the ITC suites. These companies had separate signage and their own telephone numbers. Separate signage typically distinguished independent film producers. There was no separate signage indicating Clark was any different from any other ITC executive or that he was an independent producer.

---

[2]At trial, ITC's expert testified the projections were not out of line.

Clark's written promises of ITC production and distribution, combined with the detailed and very promising ITC revenue projections, convinced respondents to enter into a production agreement. Clark also promised, on ITC's behalf, a sound track with ITC/Polygram recording artists such as Stevie Wonder and George Clinton.

A meeting was held in Clark's office, where Clark suggested Feinstein, Hunt and Chernoff should form a production company to handle film financing. As a result, StreetScenes, to handle the production, and CrewCast, to handle the payments to the crew, were formed. Respondents then started putting money into the project. Clark was in control of the money and was to be paid a producer's fee. Clark represented this was standard practice for ITC films.

In April 1996 preproduction, which lasted several weeks, commenced at the ITC offices. Clark hired the director and music director and told them both that he was doing the film for ITC, which was also to be the distributor. Clark also hired the film's accountant, who prepared credit applications for equipment rental and other forms using ITC's name and address.

Casting and rehearsals took place in ITC's conference room. A great deal of activity was occurring in the ITC offices, in full view of other ITC executives and there was a "buzz" at ITC about the film. During this same period of time Clark and others began to rewrite the script.

Once the film production started, costs began to spiral out of control and the budget was never finalized. What had been a $550,000 production soon escalated to $1 million. Clark deposited some of the money into his own personal banking account and even forged the name of the music director. At one point, while the film was being shot in Washington, D.C., Clark left for about four or five days while he went to Vancouver, Canada to work on another ITC project. This had the effect of leaving the film production floundering. During this same period of time Clark kept asking respondents for more money, referring back to the ITC projections, if respondents balked. He also provided "bogus" updates on the sound track that was in development by Stevie Wonder or other big names.

When respondents began to want explanations for the cost overruns, they asked to see the "dailies." Clark would not oblige. When they were finally allowed to see the movie, it was of such poor quality that they became concerned the whole thing was a scam. Clark, however, continued to emphasize the film's potential revenue and his belief the film could be saved. Respondents began to investigate the circumstances surrounding the making

of the film and soon discovered numerous bills had not been paid. In fact, they were sued by various vendors that supposedly had been, but in actuality had not been, paid by Clark. As a result, respondents had to hire counsel to defend those lawsuits and in some cases pay out money. They also spent a great deal of time and money attempting to resurrect the movie. Finally it was determined the film was unsalvageable.

When Attorney Rosenburg approached ITC with evidence of Clark's fraud, ITC declined responsibility and insisted Clark was an independent producer.

Following a five-week jury trial, ITC was found liable for Clark's conduct. The jury returned a special verdict finding ITC liable for Clark's fraud and also negligent in hiring and supervising Clark. Among other things, the jury awarded respondents damages for the lost profits the film would have made. At a second phase, respondents were awarded $8 million in punitive damages. The court subsequently entered judgment against ITC in the sum of $8,999,239.36 in actual damages with prejudgment interest in the sum of $1,545,706, plus $8 million in punitive damages, for a total of $18,544,945.36.

The appeal is from the judgment.

I.-III.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

IV.  *Punitive Damages Were Properly Awarded*

A.  *Proceedings Prior to the Punitive Damages Phase*

Prior to the commencement of trial, ITC made a motion to bifurcate the punitive damages issue should it arise. (Civ. Code, § 3295.) Thereafter, the issue was visited from time to time during the trial. On March 28, 2000, immediately following the swearing of the jury to retire and arrive at a verdict the following occurred:

"[DEFENSE COUNSEL]: I have been informed by Mr. Glickfield [*sic*] that my clients have the most recent consolidated financial report, and we will present that to the court immediately upon the jury returning, assuming we're going to have a second phase.

"(Off the record discussion.)

*See footnote, *ante*, page 233.

"[THE COURT]: I think how we will proceed is if we discover we are having a second phase, we will need to determine whether or not anyone is going to give an opening statement, or if you're just going to admit the report, you know, at the point in which defendant will then give it to the plaintiff, and then we'll admit the report and then just have argument . . . ."

Two days later, after the jury had returned a verdict finding ITC liable, and just before the second phase was to commence, counsel for respondents indicated he was waiting for ITC's report. Counsel for ITC then indicated there was no one in the United States that could authenticate the financial records he had brought. The court then excused the jury and placed on the record what had transpired during the trial. The court further indicated it had given ITC a chance to argue the issues and had made it very clear that it was to be done while the jury was deliberating.

At that point, and apparently for the first time, counsel indicated it was ITC's position that (1) it did not have to prove its net worth; and (2) it did not have to authenticate documents. Counsel for plaintiffs then indicated plaintiffs had served notices to appear on each of the ITC defendants and asked for a comprehensive set of financial records. He further indicated his recollection of the facts was the same as the court's. Counsel for ITC then objected saying they were not properly authenticated, they were hearsay, and they lacked foundation.

Counsel for ITC then apparently handed the court and counsel a two-page unconsolidated income statement for the 12-month period ending December 31, 1997. The court ordered the documents marked as next in order. Counsel for ITC then attempted to argue that some of the entities subpoenaed had never had an ownership interest in ITC or possessed the documents re-quested.

"[THE COURT]: Excuse me. Counsel, I already indicated to you you had an opportunity throughout this month-long trial to have raised this. You had an opportunity from the time this jury went out to deliberation. [¶] And I specifically asked you on this issue more than one day, next day we want more time, and then I said you must either argue this or produce the documents.

"[COUNSEL]: Your Honor —

"[THE COURT]: So at this time these are admitted."

ITC then called one witness who testified that ITC was now owned by different entities than those who had owned ITC when the acts occurred.

Additionally, there had been a complete changeover in personnel at ITC in the intervening period.

The jury after hearing arguments returned a verdict awarding respondents $8 million in punitive damages.

### B. *The Evidence Was Sufficient to Establish ITC Ratified or Authorized Clark's Wrongful Conduct*

■ "Ratification is a question of fact. The burden of proving ratification is upon the party asserting its existence. But ratification may be proved by circumstantial as well as direct evidence. Anything which convincingly shows the intention of the principal to adopt or approve the act in question is sufficient. (2 Cal.Jur.2d, Agency, § 102, pp. 768-769.) It may also be shown by implication. ' ". . . where an agent is authorized to do an act, and he transcends his authority, it is the duty of the principal to repudiate the act as soon as he is fully informed of what has been thus done in his name, . . . else he will be bound by the act as having ratified it by implication." ' (*Ralphs* v. *Hensler* (1893) 97 Cal. 296, 303 [32 P. 243].)" (*Hale v. Farmers Ins. Exch.* (1974) 42 Cal.App.3d 681, 691-692 [117 Cal.Rptr. 146], disapproved on other grounds in *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 822, fn. 5 [169 Cal.Rptr. 691, 620 P.2d 141].)

■ Here the evidence discloses that when ITC's general counsel was asked if ITC would reimburse respondents or assist in the attempt to finish the project, ITC demurred and indicated it would not do either. However, ITC did not repudiate Clark's acts. That in itself was evidence of ratification. (*Hartman v. Shell Oil Co.* (1977) 68 Cal.App.3d 240, 250-251 [137 Cal.Rptr. 244].) Also, ITC's explanations that Clark had a special relationship, unique to the movie industry, that enabled Clark to be an executive producer of ITC but allowed him space to do his own deals could also have been found to be evidence of ratification. A jury could determine that this relationship was created in order to give ITC deniability for Clarks actions: In other words, allowing Clark to practice low-level fraud while allowing ITC to claim high level ignorance.

ITC further argues that, because no one at ITC admitted that ITC authorized Clark's wrongful conduct, there was no evidence of authorization. Or, as ITC states, merely because the jury disbelieves a witness when he states it is not raining does not mean that it is raining. However, as pointed out by respondents, the circumstantial evidence was that the ground was wet, it was cloudy and people were carrying umbrellas. Therefore, a trier of fact could conclude it was raining, or in this case that there was ratification. Here, the

evidence also reveals from the time Clark first had contact with respondents, he attended weekly meetings with ITC executives where ongoing ITC projects were discussed. The evidence also discloses that Clark's contract with ITC was extended during the time that preproduction activities were taking place at the ITC offices. The fact that at trial, ITC took the "see no evil, hear no evil and speak no evil" defense[6] does not mean there was no evil. Respondents showed that activities were going on that had to have been noticed at ITC. Additionally, the fact that the preproduction activities were taking place down the hall from the president's office and that some of the movie people even met with the president certainly lent credence to the conclusion that ITC had authorized and ratified Clark's actions during the entire production. (*Hartman v. Shell Oil Co., supra,* 68 Cal.App.3d at p. 251.) The president's denial of these facts did not mean they were not true. It only meant, in light of the verdict, that the jury disbelieved him or found him to be credibly handicapped.

### C.  *Respondents Adequately Established ITC's Net Worth*

ITC next contends the punitive damages should be reversed because there was no admissible evidence of net worth. (*Adams v. Murakami* (1991) 54 Cal.3d 105 [284 Cal.Rptr. 318, 813 P.2d 1348].) ITC argues that because *Adams* requires evidence of the defendants' financial condition, the punitive damages portion of the judgment should be set aside. However, ITC is in no position to complain. As recently stated by Division Three of this court in *Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, 609 [92 Cal.Rptr.2d 897], a court may order a defendant to produce evidence of his or her financial condition following a determination of liability for punitive damages even if the plaintiff has not attempted to obtain that information prior to trial. Here, of course, respondents did attempt to obtain the information. In fact, when the jury retired to commence its deliberations, counsel for ITC informed the court that his clients had the most recent consolidated report and would present it to the court immediately after the jury returned should a second phase be required.

When that second phase was ready to begin, ITC suddenly reversed its direction, arguing it was not ITC's burden (1) to prove its net worth or (2) to authenticate the documents. As to the first reason, it may not be a defendant's burden to prove its net worth, but if it is ordered to produce that evidence it is under an obligation to do so. (Civ. Code, § 3295, subd. (c).) Once the court makes the order there is no justification for not specifically following that order. (See *People v. Glass* (1972) 44 Cal.App.3d 772,

---

[6]Named after the carvings of the three wise monkeys over the sacred stables at Nikko, Japan.

781-782 [118 Cal.Rptr. 797].) If counsel has problems with the court's orders, he or she may seek a pretrial writ or argue the validity of that ruling on appeal. (*Mike Davidov Co. v. Issod, supra,* 78 Cal.App.4th 597, 609.) Here, there was no error in ordering ITC to bring evidence of its financial condition to court.

The second point, the lack of authentication, has no merit. ITC presented the information to the court after being ordered to do so and after informing the court it would present the information at the proper time. The documents were from ITC and were presented to the court by ITC's counsel as per the statement of two days before. This is all the authentication that is required. (Evid. Code, §§ 1414, 1420, 1421.) Once authenticated, the two-page unaudited consolidating income statements for the 13-month period ending December 31, 1997, was an admission which was admissible against ITC. ITC's contention that the balance sheets were not audited is of no moment since there is no requirement that the unaudited balance sheets would themselves have been admissible at the trial. (See 1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, § 95, pp. 797-798.)

Once counsel for ITC presented the unaudited balance sheets in accordance with his prior representation, the balance sheets were authenticated, and were properly admitted and used against ITC. Therefore, there was evidence of ITC's financial condition for the jury to consider. (*Adams v. Murakami, supra,* 54 Cal.3d at pp. 115-116; *Robert L. Cloud & Associates, Inc. v. Mikesell* (1999) 69 Cal.App.4th 1141, 1151 [82 Cal.Rptr.2d 143].)

### D. *Should the Punitive Damages Award Be Reduced?*

Finally, ITC argues that since the judgment will have to be reduced, the punitive damages must also be reversed. (See *Liodas v. Sahadi* (1977) 19 Cal.3d 278, 284 [137 Cal.Rptr. 635, 562 P.2d 316].) However, in *Liodas,* the court reversed the entire judgment because of errors in the damage instructions. Here, however, ITC does not contest the fraud allegations. This case has already consumed an inordinate amount of trial court time. The trial itself took over five weeks to try and the reporter's transcript on appeal consists of 18 volumes. The clerk's transcript consists of 31 volumes and is in excess of 5,300 pages. The only issue left for a retrial would be to reassess punitive damages.

A jury has already heard all of the evidence concerning the fraud and has determined by clear and convincing evidence that Clark, while acting as the agent of ITC, had committed his acts with fraud, oppression and malice. The jury further found ITC with knowledge of Clark's unfitness, or with a

conscious disregard for the rights of others, employed Clark or authorized the conduct of Clark that was found to be fraudulent, oppressive or malicious. The only purpose of a remand would be to kill more trees and consume even more jury and court resources on a question that has already been answered: ITC and Clark were guilty of fraud, oppression and malice.

■ As an appellate court, this court has the duty to review and examine punitive damage awards and in appropriate cases modify the award to ensure that justice is done. (*Gerard v. Ross* (1988) 204 Cal.App.3d 968, 980 [251 Cal.Rptr. 604]; *Burnett v. National Enquirer, Inc.* (1983) 144 Cal.App.3d 991, 1010-1011 [193 Cal.Rptr. 206, 49 A.L.R.4th 1125].) An argument can also be made for the proposition that an appellate court has the inherent authority to decide punitive damages on appeal if the amount is due to bias and prejudice. (See discussion in *Teitel v. First Los Angeles Bank* (1991) 231 Cal.App.3d 1593, 1606 [282 Cal.Rptr. 916].)

However, the trial court is in a much better position than this court to rule on the punitive damages. " 'The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear the witnesses and frequently, as in this case, see the injury and the impairment that has resulted therefrom. As a result, all presumptions are in favor of the decision of the trial court [citation]. The power of the appellate court differs materially from that of the trial court in passing on this question. An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury.' (See *Schroeder* v. *Auto Driveaway Co.* (1974) 11 Cal.3d 908, 919 [114 Cal.Rptr. 622, 523 P.2d 662]; see also *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 64 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].)" (*Fagerquist v. Western Sun Aviation, Inc.* (1987) 191 Cal.App.3d 709, 727-728 [236 Cal.Rptr. 633].)

In *Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798 [111 Cal.Rptr.2d 87, 29 P.3d 175] the Supreme Court announced a new standard for determining when the statute of limitations commences under a continuing violation under FEHA (California Fair Employment and Housing Act; Gov. Code, § 12900 et seq.). Because the standard was new, the trial court had used the wrong test in ruling upon a motion for new trial. The Supreme Court determined the proper procedure was to remand the matter to the trial court to rule upon the motion for new trial using the new standard just announced. (*Richards*, at pp. 824-825.) In *Teitel v. First Los Angeles Bank, supra,* 231 Cal.App.3d 1593, 1606, the trial court used the wrong procedure in reducing the amount of punitive damages. The Court of Appeal felt the most appropriate remedy was a remand to the trial court to reconsider the motion for new trial applying the correct procedure.

■ Here, this court is faced with a situation where a portion of the verdict is being reversed. A jury having heard all of the evidence arrived at several verdicts in the millions of dollars, but they did not know what the effect of those numbers would be because the jury was merely answering questions. Having arrived at the verdict on various causes of action the jury then evaluated the conduct of defendant ITC and awarded punitive damages in the sum of $8 million. Now having reversed a portion of the judgment, the person in the best position to determine the appropriate amount of punitive damages would appear to be, in the first instance, the trial judge. Accordingly, we will employ the vehicle used by the court in *Richards v. CH2M Hill, Inc.*, and *Teitel v. First Los Angeles Bank.*

After having corrected the judgment to eliminate the loss of profits from the judgment, the trial court is to reconsider ITC's motion for new trial as it relates to punitive damages. If the court denies any reduction, then ITC may once again appeal. If respondents do not agree with any such reduction, the court may grant a new trial solely on the punitive damages issue. (See *Teitel v. First Los Angeles Bank, supra,* 231 Cal.App.3d 1593; *Krouse v. Graham* (1977) 19 Cal.3d 59, 81-83 [137 Cal.Rptr. 863, 562 P.2d 1022]; *Tan Jay Internat., Ltd. v. Canadian Indemnity Co.* (1988) 198 Cal.App.3d 695, 709 [243 Cal.Rptr. 907].) We do not decide what amount of punitive damages is appropriate. That is left up to the trial judge, who saw and heard the evidence. (*Teitel v. First Los Angeles Bank, supra,* 231 Cal.App.3d 1593.)

Should respondents reject the trial court's reassessment of the punitive damages award, any retrial shall be limited to the sole issue of the amount of punitive damages to be awarded. ITC may not contest the issue of fraud or that Clark was its agent.

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court for further proceedings not inconsistent with the views expressed herein. Each side to bear its own costs on appeal.

Johnson, Acting P. J., and Woods, J., concurred.

A petition for a rehearing was denied November 26, 2002, and appellants' petition for review by the Supreme Court was denied January 15, 2003.