Filed 12/9/13  Roe v. Los Angeles Unified School Dist. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ROE, a Minor, etc., et al., | B240654 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC430109) |
| v. | |
| LOS ANGELES UNIFIED SCHOOL DISTRICT et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment and a postjudgment order of the Superior Court of Los Angeles County, Terry A. Green, Judge, and Joseph R. Kalin, Judge (retired judge of the L.A. Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.). Affirmed.

Yukevich | Cavanaugh, James J. Yukevich, Delmar S. Thomas and Chris S. Pacetti for Plaintiffs and Respondents.

Gutierrez, Preciado & House, Calvin House and Arthur C. Preciado for Defendants and Appellants.

————————————————

A jury found in favor of Roe[1] in his lawsuit against the Los Angeles Unified School District (LAUSD) and administrators, and awarded him a total of $1 million against the individual defendants in damages for past and future emotional distress, as well as $15,250 in economic damages. LAUSD appeals from the judgment and trial court's denial of its motion for a new trial, arguing that the emotional distress damages award was excessive. We affirm.

## BACKGROUND

A first amended complaint alleged that in February 2009, when Roe was 12 years old, LAUSD administrators used Roe as bait in a drug sting on the campus of Porter Middle School (Porter), giving Roe money and instructing Roe to attempt to purchase marijuana from another student. The administrators did not notify Roe's parents or law enforcement. As a result, Roe suffered bodily harm and emotional distress, and incurred medical expenses. The complaint alleged causes of action for negligent supervision, negligent failure to perform mandatory duties, civil conspiracy, intentional infliction of emotional distress, and negligent infliction of emotional distress, and requested general and special damages, economic damages, punitive damages, and attorney fees.

I. **Trial testimony**

A. *LAUSD employees*

Porter Assistant Principal Armando Mejia testified that he was in charge of discipline at Porter, and was the direct supervisor of Laura Custodio, the Dean of Students. Custodio approached Mejia with the idea that Roe would purchase marijuana from a 14-year-old student who was assigned to work in the attendance office. Custodio told Mejia that with $5 she could get drugs from the 14 year old, using Roe as a decoy to buy the drugs and then give them to Custodio. Custodio and Mejia met with Joyce Edelson, the principal, who approved a plan to give Roe money to buy drugs from the 14

---

[1] The record on appeal does not disclose minor's name. Therefore, we refer to the minor as Roe.

year old. Mejia did not contact Roe's parents before or after the drug sting took place on February 18, 2009.

A sergeant with the Los Angeles School Police Department who investigated the drug sting testified that LAUSD filed a suspected child abuse report based on the sting.

Jesus Barbosa worked as a campus aide at Porter in February 2009. Custodio ordered Barbosa to hide in a boy's bathroom stall to watch the drug sting as it occurred, telling Barbosa that Roe would buy the drugs, put them in his pocket, and transport them to her. The purpose of the plan was to be able to expel the drug seller.

Barbosa told Custodio the sting was not proper, but after consulting with her superiors, Custodio told him to go ahead with it. Custodio gave Roe a $5 bill marked with red ink so it could be identified later to bust the seller. The first time Barbosa hid in the stall, he observed Roe come out of another stall and ask the student seller if he could buy some drugs, and the seller said he didn't have any with him, and would sell some to Roe at the front of the school. Roe went back to class. Custodio told Barbosa to do it again, and Barbosa pulled Roe out of his class, took him outside, and told him they were going to try a second time. The student seller entered the bathroom again, and Roe again left the stall and asked him for drugs. The seller looked into Barbosa's stall, and when he saw Barbosa, he immediately left the bathroom. Barbosa took Roe to Custodio's office, and she wrote out a fake detention slip for Roe, who then went back to class. Barbosa later learned that a third attempt at a drug buy from the seller, which he did not supervise, had succeeded.

Custodio testified that Roe had been in her office more than once for being disruptive. On February 18, 2009, Custodio read Roe's written statement that the 14 year old had offered to sell drugs to Roe for $5, and Roe had told him that he did not have the money. Custodio told Barbosa to get Roe out of class and bring him to Custodio's office. She went over Roe's statement with him, believing that he had not done anything wrong, and thought: "If all it's going to take is $5 to get those drugs off my campus, I've got $5. Problem solved." She went and got permission from Mejia, and then they both went to talk to Edelson, who said, "go for it."

3

Custodio went back to her office, found a $5 bill, marked it with red ink and gave the marked bill to Roe. Barbosa and Roe left the office to implement the plan to buy drugs in the bathroom. Custodio knew the first attempt had failed, but just after the bell rang Roe walked into her office by himself, holding two small pieces of marijuana. Roe wrote a statement and went home as usual.

Custodio called the LAUSD police, and went to look for the seller, who ran away when she called his name. The police later told her she could not discipline the seller as "we don't use minors as operatives," and therefore it was not a "good bust." She did not call Roe's parents.

Principal Edelson testified that on February 18, 2009, Custodio told Edelson she wanted to give a marked bill to a student to buy drugs and bring them back to Custodio, who would then call school police and give them the drugs. Edelson made a split-second decision to authorize Custodio to give the money to the student. Edelson now understood it was against LAUSD policy to involve a student in the purchase of drugs on campus.

A former LAUSD operations coordinator who had overseen discipline in the local district testified that Roe's father, D.C., contacted her after the drug sting, and said he believed Roe had been placed in danger of retaliation. The operations coordinator wrote a letter offering to transfer Roe to one of several other schools for safety reasons. Roe was later transferred to a different middle school (middle school one), and the district provided transportation and offered school mental health counseling. To avoid gossip, rumors, and possible retaliation, LAUSD stopped making other transfers to middle school one. Roe later battered another student, and was transferred for a second time (middle school two).

An academic intervention support provider at middle school one testified for the defense that when she worked with Roe toward the end of 2009, he always was upbeat and never seemed sad, upset, or worried. A counselor at middle school one who worked with Roe for a short time also testified for the defense. Roe denied to her that he was in a fight, and later told another counselor that he had participated. Roe subsequently violated a behavior contract by sexually harassing a student.

4

## B. Roe and his family

Roe, 14 years old at the time of trial, testified that in February 2009 he was 12 years old and one of the smallest kids in the seventh grade. The drug seller was a big kid who was a bully. Roe had never bought or exchanged drugs with the seller, but the day before the sting the seller tried to sell him drugs in front of the school four or five times. He told his mother that day when she picked him up.

The day of the drug sting Roe was sent to Custodio's office for talking in class. He felt he was disappointing her because he had been staying out of trouble, and wanted her to keep being proud of him. He told her that Doe had tried to sell him drugs, and Custodio told him to take the marked $5 bill, buy the drugs, and bring them right back to her. The marked bill scared him because he knew the marking would alert the seller that Roe had set him up. After the two unsuccessful attempts, Custodio told him to go back again and get the drugs. Roe went back to class thinking that Custodio knew that the third transaction would be at the flagpole. After class ended Roe went out to the flagpole.[2] The seller was there, surrounded by his friends (some of whom did not go to Porter), and Roe was afraid that if they found him out they would jump him.

Roe bought drugs with the $5, told them that he had to go to the restroom, and went back to Custodio's office as instructed. Custodio said "wow" when she saw the drugs, but Barbosa was shaking his head. They sent Roe to the attendance office, which scared him, because the seller was in the next room. He called his mom, whispering that he'd call her back when he needed pickup. When he left, unescorted, he was scared because he thought the seller and his friends would be waiting for him.

Roe believed the seller was affiliated with a gang, because he dressed like a gang member and would throw gang signs; his friends told him the seller was now in a gang called Pacoima. After the drug sting, he was with his mother picking up his sister from high school and saw the seller, who made a gun sign at Roe and pretended like he was

---

[2] Roe later testified that the transaction took place in front of the school but not by the flagpole.

5

pulling the trigger, meaning "I still have it coming." After that event, Roe was disciplined for bringing a pocketknife to school, which he did because he was afraid. Another time, Roe was at football practice and saw the seller outside with a group of older friends in a car, so Roe hid behind his friends.

Since the drug sting, he was not the same anymore. He "just walk[ed] around worried, watching [his] back," afraid to trust anyone and feeling bad that his sister had to change schools. Immediately after the sting, he received threatening texts. He saw news coverage, but his name was not disclosed.

R.C., Roe's mother, testified that when she picked Roe up at school on the day before the drug sting, he told her that a crowd of kids in front of the school had been offering to sell him drugs. She asked him why he hadn't told anyone at school, and he looked at her like she was crazy and said he would be called a snitch. She told him that if it happened again, he should tell someone, and he said he would. Around 4:30 p.m. the next day (the day of the sting) Roe called her and said he was whispering because of what he had told her, but he couldn't tell her more, and hung up. She called the school back, and heard someone ask Roe why he hadn't told his parents, and he said, "you guys told me not to tell anyone." Roe got on the phone and because the boy with the drugs was in the other room, told R.C. he could not talk. She drove to the school to pick Roe up. When he told her about the drug sting, she was in shock. If she had been notified, she would never have agreed to the sting.

Roe had transferred from another school to Porter because he had alopecia, a hair loss condition, and the bald spots on his head had made students at the other school think he was a gang-banger and they bullied and teased him. About a year after the drug sting, after Roe transferred to middle school two, they were driving to pick up his sister from high school, when Roe told R.C. he saw the drug seller. Roe said the boy had made a gesture as if to pull out a gun and shoot Roe, but not to tell anyone because he didn't want anyone else to know. Roe had nightmares about the seller chasing him and shooting him.

6

After the drug sting incident R.C. would not let her children go outside or go out with their friends because something could happen to them. Her other three children blamed Roe. Her husband was doing nothing but sleeping and eating, and at one point the couple briefly separated. LAUSD offered counseling to the family, but she no longer trusted anyone who worked for LAUSD. Roe told her that he could not be a normal kid because of what the school made him do, and he did not want her to drive him anywhere because he was afraid that something might happen to his mother. R.C. feared retaliation by the seller and his friends against Roe, who had been labeled a snitch.

On cross-examination, R.C. testified that she had received a number of calls from Custodio about Roe's behavior before the drug sting incident. She later learned that Roe had received texts about the drug sting, some of which reported threats against Roe. At the time of trial, Roe was being home-schooled.

V.C., Roe's older sister, testified that she transferred to another high school after the incident for fear of the seller, and confirmed that she also saw the seller gesture at Roe as if holding a gun. Roe had shown her texts and appeared to be scared. Fear of the seller kept the family from going out as they used to, and her relationship with Roe had deteriorated because she blamed him for the restrictions. "Roe sometimes gets scared. He mentions [the seller] coming out. It's not fun. It's scary."

D.C., Roe's father, testified that the drug sting violated his trust in the school district. Roe was not the same kid afterwards, always on the defense, frightened, and not trusting anyone. Roe could not be like a regular kid; his opportunities to do what other kids could do had been taken away, and D.C. could see that his son was sad. Roe was only 12 when it happened, and as time went by, Roe realized how serious this was.[3]

### C. *Expert testimony*

A plaintiff's expert on education testified that Custodio exceeded her authority and that Roe participated in the drug sting to please authority figures and to make the seller

---

[3] After the close of Roe's case, the court granted the defendants' motion for partial nonsuit as to R.C.'s and D.C.'s claims of negligent and intentional infliction of emotional distress and breach of a mandatory duty, as well as Roe's claim of a mandatory duty.

stop bothering him. The school administrators did not comply with school policy in failing to notify Roe's parents, failing to protect Roe, failing to investigate the risk involved, and failing to call the school police as required when drugs were on campus. The administrators had encouraged Roe to commit a crime, and breached their duty to protect students. LAUSD had abandoned Roe after the sting, failing to help him and his family during his transition.

A psychologist who did an in-depth evaluation of Roe and had evaluated his parents testified that in her opinion, Roe had posttraumatic stress disorder (PTSD). Symptoms included an inability to get a traumatic event out of his mind (including nightmares), becoming withdrawn and emotionless, and being hypervigilant, irritated, and angry. Roe told the psychologist that his life had changed a lot as a result of the drug sting, which he called "the big mess." He showed signs of depression, anxiety, social detachment and unstable emotions. Before the drug sting, his behavior issues were mischievous; afterwards, his behavior issues were more serious and aggressive, which showed anger and distrust of others. Roe's father showed signs of depression, paranoia, and PTSD caused by knowing that Roe was at risk after the sting. Roe's mother, R.C., also showed signs of depression and social isolation. In her opinion, Roe and his parents had suffered levels of emotional distress, and they had not exaggerated their symptoms. More than LAUSD counseling and transfer to a different school was required. The family needed to move outside of LAUSD. It was not clear to the psychologist how long Roe and his father will continue to suffer from PTSD, but PTSD "can last a long time, and it does need intervention." On cross-examination, the psychologist agreed that Roe had told a psychiatrist whose records she reviewed that his anxiety had lessened.

A clinical neuropsychologist testified for the defense that she performed a comprehensive neuropsychological evaluation of Roe. Her report diagnosed adjustment disorder with anxiety connected to the drug transaction, as well as an undiagnosed attention deficit hyperactivity disorder (ADHD) that had contributed to the behavioral difficulties Roe had in school before and after the drug sting, and a learning disability. The neuropsychologist did not believe that Roe had PTSD, and challenged the accuracy

8

and the methodology of the plaintiff's psychologist's report. Some of Roe's anxiety was related to his ADHD and to the ongoing litigation. On cross-examination, she stated that the drug sting had increased Roe's anxiety.

## II. Jury verdict and motion for new trial

The jury found in favor of Roe.[4] On the special verdict form, the jury answered "yes" to the questions whether the conduct of each of the three individual defendants (Custodio, Edelson, and Mejia) was outrageous and whether each acted with reckless disregard of the possibility that Roe would suffer emotional distress. The jury also found that Roe suffered severe emotional distress, with each defendant's conduct a substantial factor. The jury awarded $500,000 for past noneconomic loss and $500,000 for Roe's future noneconomic loss. The jury awarded $250 in past economic loss and $15,000 for future economic loss (tutoring for Roe). The jury did not award any punitive damages.[5]

Judgment was entered on February 3, 2012. The defendants filed a motion for new trial on March 2, 2012, arguing that Roe's closing argument was improper and prevented a fair trial, and the damages award was excessive. Roe filed an opposition, and the defendants filed a reply.

The hearing on the new trial motion took place on April 13, 2012 before Judge Joseph R. Kalin, sitting by assignment for Judge Terry A. Green, who presided at trial and was unavailable. The trial court commented that it had not thoroughly read the transcripts but would do so before ruling on the motion, because that was necessary given the points raised in the motion for new trial.

---

[4] No finding by any trier of fact was made as to liability to Roe's parents R.C. and D.C., and their causes of action were dismissed by operation of law.

[5] The jury also found that Edelson, Mejia, and Custodio were negligent in their supervision of Roe, and that the negligent supervision was a substantial factor in causing harm to Roe. The jury answered "yes" to the question whether the three defendants violated Health and Safety Code section 11361, subdivision (a) (employing a minor under 14 in an unlawful drug transaction), and found the violation was a substantial factor in causing harm to Roe. The jury found that the defendants did not engage in a civil conspiracy.

Defendants' counsel argued that the drug sting was an isolated incident, there was no objective evidence of injury to Roe to support the substantial recovery for emotional distress, and LAUSD did not retaliate against Roe but attempted to help him. As a result, the weight of the evidence did not support the emotional distress claim. The excessive amount of damages for emotional distress was the result of Roe's counsel's improper references to LAUSD's duty to indemnify and the suggestion that the jury should "send a message to the school district," even though punitive damages could not be imposed on a public entity. The "outrageous award . . . was the product of counsel's misrepresentations, the incendiary comments that were made, the prejudicial comments."

Roe's counsel rejoined that the jury was unanimous in its verdict, and there was no miscarriage of justice. Counsel also pointed out that LAUSD was a defendant in the lawsuit along with the individual employees, and under Government Code section 815.2, would be responsible for the torts of individual employees. Roe's counsel never mentioned punitive damages against LAUSD, and a specific instruction was given that no such damages could be awarded. In any event, the jury did not award punitive damages against the individual defendants. Further, counsel pointed to the testimony regarding threats against Roe and the therapist's testimony, as well as the testimony that a child abuse report was filed by LAUSD. The jury verdict was reasonable in light of the evidence, and there was no miscarriage of justice. Counsel also referred to the "emotional element" in the courtroom in a case with "significant public interest and societal impact. . . . [¶] . . . This is a 12-year-old who was used in a drug sting to catch a drug dealer who was a gang member, without any assistance from law enforcement and without the consent of his parents." Roe was traumatized as a result and his educational career was truncated.

The trial court denied the new trial motion by written order on April 25, 2012, and the individual defendants filed this timely appeal from the judgment.[6]

---

[6] The ruling on a motion for new trial is reviewable on appeal from the judgment. (*In re Marriage of Liu* (1987) 197 Cal.App.3d 143, 153, fn. 4.)

**DISCUSSION**

We review the denial of the motion for a new trial for abuse of discretion, "mindful of the fact that the trial judge is accorded a wide discretion in ruling on a motion for new trial and that the exercise of this discretion is given great deference on appeal." (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 871–872.)  In reviewing an order denying a new trial, we review the entire record to make an independent determination as to whether the claimed error was prejudicial.  (*Id.* at p. 872.)

**I.       Statements by the plaintiffs' attorney did not result in a grossly excessive verdict.**

On appeal, the defendants argue that the plaintiffs' attorney made improper remarks in closing argument, and that these remarks contributed to the excessive award. "Misconduct by counsel in closing argument can constitute prejudicial error entitling the aggrieved party to reversal of the judgment and a new trial." (*Collins v. Union Pacific Railroad Co.* (2012) 207 Cal.App.4th 867, 882–883 (*Collins*).)

The defendants identify three remarks.  First, plaintiffs' counsel stated:  "And I just want to make it clear, when you find those three administrators—or two administrators and the dean on the verdict form, that it's Los Angeles Unified School District, that big public entity, that's responsible, because they're within the scope of employment."  Second, counsel stated:  "And in this case, where people are going to look at this and say, can school districts get away with this, I'm asking you to award no less than $10 million [for past emotional distress, and the same amount for future emotional distress].  [¶] . . . [¶]  Roe's verdict for his emotional injuries must fully compensate him and make it painful so future safety of children in school districts is preserved."  Third, counsel stated:  "It's the Los Angeles Unified School District, on negligence per se and negligent supervision, that's going to pay the money.  And they should pay the money."

11

The defendants' counsel did not object to the first and third of these statements.[7] When there is no objection to statements in closing argument, "such error [is] considered forfeited" upon review of the trial court's denial of a new trial motion. (*Collins*, *supra*, 207 Cal.App.4th at p. 883; *Neal v. Montgomery Elevator Co.* (1992) 7 Cal.App.4th 1194, 1198.) Even if we were to evaluate this argument, we would reject it. LAUSD was a named defendant, and the jury was instructed that Government Code section 815.2, subdivision (a), provides "a public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee."

Defendants' counsel did object to the statement that the jury should award $20 million in emotional distress damages to fully compensate Roe and "make it painful." This statement did not tell the jury that LAUSD, rather than the individual defendants, could be held liable for punitive damages. Counsel's remark followed immediately his summation of Roe's emotional suffering, "fright, nervousness . . . constant fear for his own safety, his parents' safety, his sister's and brothers' safety. And he's had that fear since they say this sting happened. It's a fear he'll keep having. [¶] And [the psychologist] told us about the nerves, the emotional pain, and that PTSD can last a lifetime. It won't go away." This portion of counsel's argument properly referenced the evidence supporting a large compensatory damages award for emotional distress. The use of the phrase "make it painful" does not constitute misconduct justifying overturning the jury verdict.

Further, at the time of counsel's remark, the issue of whether to award punitive damages against the individual defendants was still on the table. The jury received proper instructions on compensatory and punitive damages, including that punitive damages required clear and convincing evidence of "malice, oppression or fraud." The

---

[7] Defense counsel later stated he "forgot" to object to the statement that LAUSD would pay the damages of the individual defendants, and the court pointed out that he was too late.

jury expressly determined that none of the individual defendants acted with "malice, oppression, or fraud" as defined by the instructions, and no punitive damages were awarded. It is speculation and contrary to the verdict to conclude that the jury intended its compensatory damages award for emotional distress (one-twentieth of what counsel requested in his argument) to be an award of punitive damages.

Finally, "[c]ounsel's comments, however, even if improper, do not warrant reversal. . . . [I]n the context of the case as a whole, and of the parties' arguments, counsel's comments were not particularly egregious. The suggestion that the jury should send a message to the [district] through its award of damages was, in context, less a plea for punitive damages than a plea for a verdict of liability. The 'message' simply was that the [district] should be held liable . . . ." (*Nishihama v. City and County of San Francisco* (2001) 93 Cal.App.4th 298, 305–306.) We see no likelihood that counsel's statement had any effect on the verdict, so even assuming the statement was error, it was harmless. "The trial court had no discretion to grant a new trial in the absence of prejudicial error. [Citation.] As any error here was harmless, the trial court's ruling was correct." (*Id.* at p. 306.)

## II. Substantial evidence supported future damages for emotional distress.

The defendants argue that the evidence was insufficient—that there was "no evidence"—to support any damage award for future emotional distress. Code of Civil Procedure section 657, subdivision (6) provides that a new trial may be granted on the grounds of "[i]nsufficiency of the evidence to justify the verdict," and cautions: "A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision, nor upon the ground of excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." Our inquiry begins and ends with a determination whether there is any substantial evidence, contradicted or uncontradicted, to support the jury finding. (*Carter v. Entercom Sacramento, LLC* (2013) 219 Cal.App.4th 337, 350.)

13

A plaintiff must offer competent proof of emotional distress. (*Austero v. Washington National Ins. Co.* (1982) 132 Cal.App.3d 408, 417, disapproved on other grounds in *Brandt v. Superior Court* (1985) 37 Cal.3d 813, 816–818.) The testimony of the plaintiff may suffice to support an award of damages for emotional distress, but the emotional injury must be substantial or enduring, not "trivial or transitory." (*Tan Jay Internat., Ltd. v. Canadian Indemnity Co.* (1988) 198 Cal.App.3d 695, 708.)

Our review of the record, as reflected in our description of the trial, reveals evidence supporting damages for future emotional distress. The psychologist who examined Roe opined that he had PTSD, and that it would continue until some intervention created a sense of safety for Roe and his family (perhaps therapy and a move out of the district) so he can move on psychologically. Roe testified that he still walked around worried, watching his back, afraid to trust anyone and feeling bad about the impact on his family. Roe's parents testified that he was a different child, frightened and sad. Roe's sister testified that Roe still got scared and "mentions [the seller] coming out." All this is substantial evidence that Roe continued to suffer emotional distress and/or PTSD, and his emotional injury was not trivial or transitory. We are not convinced from our review of the entire record that the jury should not have awarded damages for future emotional distress.

**III.     The amount awarded was not so excessive as to suggest passion or prejudice.**

The defendants' final argument is that the award of $500,000 for past emotional distress and $500,000 for future emotional distress was excessive. "'Upon appeal, the decision of the trial court and jury on the subject [of the amount of damages] cannot be set aside unless the verdict is "so plainly and outrageously excessive as to suggest, at the first blush, passion or prejudice or corruption on the part of the jury."' [Citations.] This test, it must be admitted, imposes an extremely heavy burden on an appellant claiming excessive damages." (*McNulty v. Southern Pacific Co.* (1950) 96 Cal.App.2d 841, 846; *StreetScenes v. ITC Entertainment Group, Inc.* (2002) 103 Cal.App.4th 233, 245 [to be excessive, award must "shock[] the conscience"].) "'[T]here is no fixed or absolute

14

standard by which to compute the monetary value of emotional distress.' [Citations.] Therefore, citation to awards in other cases is of no value to the court in assessing the propriety of damages in this case. [Citation.]" (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1068, fn. 17.)[8]

A plaintiff may recover for emotional distress including "fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal. [Citations.] Admittedly these terms refer to subjective states, representing a detriment which can be translated into monetary loss only with great difficulty. [Citations.] But the detriment, nevertheless, is a genuine one that requires compensation [citations], and the issue generally must be resolved by the

---

[8] On appeal, the defendants cite to a 1931 California Supreme Court case finding that a jury award of $35,000 for the loss of an eye (not emotional distress) was excessive, based on average awards for the loss of an eye, and reducing the damages to $16,000 based partly on a similar case. (*Maede v. Oakland High School Dist.* (1931) 212 Cal. 419, 425.) Defendants also point to two jury verdicts cited in their new trial motion as "comparable verdicts." In 2005, a 19-year-old male high school student who left school for an independent study program when other students harassed and injured him recovered $175,000 for emotional distress. In 2010, a jury awarded $39,950 to compensate a child who was traumatized when she sustained puncture wounds from staples when trying on shoes. Those cases are clearly distinguishable on their facts, and illustrate the difficulty of comparative analysis in evaluating an excessive damages claim when the award is for emotional distress. Further, the defendants argue that cases Roe presented as comparable in his opposition to the new trial motion were distinguishable on other grounds. The plaintiffs, in turn, cite in their respondent's brief the same 18 cases that they cited in their opposition to the motion for new trial, in which substantially higher damages awards resulted, all but one over $1 million. All but four awards were a result of settlement. Again, even if we were to consider these citations to emotional distress awards in other cases, they would not be a basis for overturning the award. (*Watson v. Department of Rehabilitation* (1989) 212 Cal.App.3d 1271, 1294.) We are charged with evaluating whether the jury award in this case was the result of passion, prejudice, or corruption. As the dissent stated in *Maede*, "[T]here is nothing in this record which points to any prejudice or passion on the part of the jury. The trial court, in which the discretion in this matter must be vested, so concluded in denying the motion for a new trial. This court has arbitrarily and as a result of considerations outside the record, determined that a certain sum is adequate compensation for the injury, in the face of a contrary determination by the jury and the trial court. I think that this is beyond its powers." (*Maede*, at p. 426.)

'impartial conscience and judgment of jurors who may be expected to act reasonably, intelligently and in harmony with the evidence.' [Citation.]" (*Capelouto v. Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892–893.) In evaluating the contention that the damage award in this case was excessive, we resolve every conflict in the evidence in Roe's favor and give him the benefit of every reasonable inference drawn from the record. (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 508.)

Roe was 12 years old when he was used in the drug sting by the very individuals charged with his care and supervision. As we described above, there was testimony at trial that after the sting, Roe received threats, including one from the seller, and was fearful, anxious, and afraid of retaliation; he was not the same afterwards. He changed schools twice to avoid encountering the seller again, and wanted to leave LAUSD altogether. His relationship with his family deteriorated, and his parents and siblings saw that he had changed. Especially given Roe's youth and vulnerability, we are unable to conclude that a total of $1 million in damages for past and future emotional distress shocks the conscience. "The jury . . . could have concluded that he was suffering from emotional distress that significantly altered his ability to enjoy life and to engage in ordinary activities, that interfered with his family life, and that included fear of physical harm . . . . [The damages award] was not excessive as a matter of law in light of the evidence presented at trial . . . ." (*Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 821.)

The trial court did not abuse its discretion in denying the motion for a new trial.

## DISPOSITION

The judgment and the order denying the motion for new trial are affirmed.
Respondents are to recover costs on appeal.

NOT TO BE PUBLISHED.


JOHNSON, J.


I concur:


ROTHSCHILD, Acting P. J.

17

CHANEY, J.

I respectfully dissent. Although I do not condone the conduct of LAUSD employees in utilizing a young male student to apprehend another student selling illegal drugs on campus, in my view, plaintiff's counsel committed misconduct by making improper comments during his opening argument. This misconduct entitles defendants to a new trial on damages on two grounds: (1) irregularity in the proceedings that prevented defendants from having a fair trial and (2) excessive damages. (Code Civ. Proc., § 657, subds. (1) & (5).)

**Plaintiff's counsel committed misconduct by asking the jury to "send a message."**

During opening argument at the end of trial, plaintiff's counsel made two statements that taken together constitute misconduct. First, plaintiff's counsel stated: "And I just want to make it clear, when you find those three administrators -- or two administrators and the dean on the verdict form, that it's Los Angeles Unified School District, that big public entity, that's responsible, because they're within the scope of employment." Plaintiff's counsel also stated: "And in this case, where people are going to look at this and say, can school districts get away with this, I'm asking you to award no less than $10 million [for past emotional distress] [¶] . . . . [and] $10 million [for future emotional distress]. [¶] Roe's verdict for his emotional injuries must fully compensate him and make it painful so future safety of children in school districts is preserved."

Punitive damages may not be awarded against a public entity. (Gov. Code, § 818.) Punitive damages imposed on a municipality would burden innocent taxpayers and have little deterrent effect on public employees not financially liable for their actions. (*McAllister v. S. Coast Air Quality Management Dist.* (1986) 183 Cal.App.3d 653, 660; *City of Newport v. Fact Concerts, Inc.* (1981) 453 U.S. 247, 267.)

When punitive damages may not be awarded, any suggestion that the jury should "send a message" by inflating the damage award is improper. (*Nishihama v. City and County of San Francisco* (2001) 93 Cal.App.4th 298, 305.) An argument that the jury should "send a message" is an invitation to award punitive damages. (*Collins v. Union*

1

*Pacific Railroad Co.* (2012) 207 Cal.App.4th 867, 883.) Section 818 of the Government Code prohibits awarding punitive damages against a public entity that are designed to punish the defendant rather than compensate the plaintiff. (*Marron v. Superior Court* (2003) 108 Cal.App.4th 1049, 1060.) Thus, counsel may not make any remarks that suggest that the jury should inflate the damage award to punish a public entity.

Plaintiff's counsel said in essence "send a message" to LAUSD. The message was clear that the jury should award high compensatory damages to punish LAUSD for allowing school officials to use a young boy in an on-campus drug sting. The statement "make it painful so future safety of children in school districts is preserved" clearly asserts that the jury should award damages to both punish LAUSD and deter other school districts from the same conduct. The statement "where people are going to look at this and say, can school districts get away with this, I'm asking you to award no less than $10 million" blatantly asks the jury to award exemplary damages to prevent other school districts from engaging in the same behavior.

During oral argument before this court, plaintiff's counsel posited that this rhetoric was simply a plea for the jury to award the high-end of the suggested emotional distress damages. Although plaintiff's counsel referenced Roe's emotional suffering during his argument for damages, his comments urging the jury to punish LAUSD transformed his entire argument into an argument for unlawful punitive damages. Plaintiff's counsel did not simply state, "my client has suffered $10 million worth of damages and will suffer $10 million worth of additional damages in the future." Instead, plaintiff's counsel asked for this amount to "make it painful" and to ensure that school districts could not "get away with this." Damages that served as punishment and deterrence are punitive, not compensatory. (See *Ferguson v. Lieff, Cabraser, Heimann & Bernstein* (2003) 30 Cal.4th 1037, 1046 [defining punitive damages as damages intended to punish the wrongdoer and deter him and others from similar extreme conduct].)

This request for punitive damages was particularly improper given that the phase awarding punitive damages against the individual defendants had been bifurcated and the

amount of punitive damages was to be tried later.[1]  While plaintiff's counsel was permitted to make arguments regarding a finding of malice, oppression and fraud against the individual defendants, he should not have made any arguments related to the amount of punitive damages to be awarded.  Plaintiff's counsel's remarks to "make it painful" and "set an example" were improper arguments asking the jury to award an amount of exemplary damages to punish LAUSD.  That punitive damage liability was still at issue in no way excuses plaintiff's counsel's comments.

The proper vehicle to obtain punitive damages was first to obtain a finding of malice, oppression or fraud from the jury on an intentional tort against the defendants in phase one, then advance to phase two for the consideration of an actual monetary award. The procedure here was in essence to request a punitive damage award against a public entity on negligence-based causes of action through such phrases as "make it painful" and "send a message by making an example."  By overstepping the bounds of permissible argument, plaintiff's counsel inflamed the passions of the jury and led the jurors to believe that an inflated award amount, not compensation for actual emotional distress, was expected.  Thus, plaintiff's counsel committed misconduct by asking the jury to award unlawful punitive damages against LAUSD during his opening argument.

---

[1] The record contains defendants' motion to bifurcate issues of liability from issues of punitive damages.  A defendant has an absolute right to bifurcation under Civil Code section 3295, subdivision (d).  It provides that "[t]he court shall, on application of any defendant, preclude the admission of evidence of that defendant's profits or financial condition until after the trier of fact returns a verdict for plaintiff awarding actual damages and finds that a defendant is guilty of malice, oppression, or fraud in accordance with Section 3294."  "While the statute refers only to evidence of the defendant's financial condition, in practice bifurcation under this section means that all evidence relating to the *amount* of punitive damages is to be offered in the second phase, while the determination whether the plaintiff is *entitled* to punitive damages (i.e., whether the defendant is guilty of malice, fraud or oppression) is decided in the first phase along with compensatory damages." (*Holdgrafer v. Unocal Corp.* (2008) 160 Cal.App.4th 907, 919.)  Both the jury instructions and the special verdict form are consistent with the grant of defendants' motion to bifurcate, as both indicate that the amount of punitive damages, if any, were to be determined after liability had been established.

**Plaintiff's counsel's misconduct entitles defendants to a new trial on the grounds of irregularity in the proceedings and excessive damages.**

### 1. Irregularity in the Proceedings (Code Civ. Proc., § 657, subd. (1)).

Misconduct of counsel amounts to an irregularity in the proceedings entitling defendants to a new trial if it is reasonably probable that defendants would have obtained a more favorable result absent the misconduct. (*McCoy v. Pacific Maritime Ass'n* (2013) 216 Cal.App.4th 283, 303.) I find it reasonably probable that the jury would have reached a verdict more favorable to defendants in the absence of plaintiff's counsel's statements that the jury should award damages to punish LAUSD. These inflammatory remarks shifted the focus away from Roe's compensable injuries and encouraged the jury to award unlawful exemplary damages that far exceeded Roe's suffering. Therefore, the error was not harmless. (See *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 802 [holding that misconduct by counsel constitutes prejudicial error if it is reasonably probable that defendants would have achieved a more favorable result in the absence of counsel's misconduct].)

Although LAUSD was not a named defendant on the special verdict form, the jury had been instructed that LAUSD would be responsible for any monetary award and plaintiff's counsel effectively argued the case against LAUSD, not the administrators.[2] Moreover, a punitive damage award was not at issue or "on the table" at this stage in the trial. Thus, the only means for the jury to punish LAUSD as requested was to award unreasonably high emotional distress damages. I would therefore find that defendants are

---

[2] LAUSD was referred to as a defendant throughout the jury instructions. The jury was explicitly informed that LAUSD was going to pay only the damage awards on the negligence per se and negligent supervision causes of action, and was therefore not responsible for punitive damages against the individual defendants. In closing argument, plaintiff's counsel stated, "It's the Los Angeles Unified School District, on negligence per se and negligent supervision, that's going to pay the money. And they should pay the money." Moreover, the jury was instructed that LAUSD was liable for injuries caused by school administrators within the scope of their employment under Government Code section 815.2.

4

entitled to a new trial because plaintiff's counsel's misconduct created an irregularity in the proceedings that prevented a fair trial.

## 2. Excessive Damages (Code Civ. Proc., § 657, subd. (5)).

Damages are excessive when the verdict is so large that it shocks the conscience and suggests passion or prejudice on the part of the jury. (*Neumann v. Bishop* (1976) 59 Cal.App.3d 451, 491.) To evaluate whether a judgment is excessive and a new trial on damages is warranted, it is necessary to consider plaintiff's counsel's contribution to such a result. (*Id.* at p. 469.) Here, any of plaintiff's counsel's comments alone is sufficient to grant a new trial on damages. Taken together they constitute overwhelming evidence of a blatant attempt to inflame the passion and prejudices of the jury to punish LAUSD through a highly inflated award of emotional distress damages.[3] As a result, the jury awarded $1 million in compensatory damages to Roe.

Consideration of similar cases proffered by the plaintiff further illustrates that the verdict was a result of passion and prejudice. While recognizing that each case must be decided on its own facts and circumstances, review of other awards is helpful to show the effect of plaintiff's counsel's conduct in unlawfully inflating the damage award. (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 508.) The cited cases between students and school districts that resulted in an award of $1 million or more all involve far more egregious conduct than this case. Plaintiff cites five purportedly similar jury awards from unpublished cases to support the verdict. These cases include child abuse of a special needs student, sexual abuse by a teacher, repeated forced sexual intercourse with a teacher, repeated sexual molestation by another student, and failure to address continuous verbal and physical racial harassment of a student.

---

[3] Plaintiff's counsel's intent to inflame the passions of the jury can be seen from the very beginning of his opening argument when he discusses the irrelevant, confusing and inflammatory story of school administrators placing a hidden camera on a little girl being sexually molested at school to his closing statements asking that the damages "make it painful" for LAUSD.

5

Roe was not subject to physical abuse, repeated racial harassment, or recurring sexual molestation.  The school administrators' conduct was not continuous or intentionally harmful.  Roe was asked to buy drugs from another student only once and the defendants did not intend to cause Roe harm.  That Roe received an amount similar to jury verdicts in far more appalling cases illustrates that the verdict was a result of passion and prejudice.  Thus, I would find that the defendants are also entitled to a new trial because the damage award is excessive.

**Defendants timely objected.**

The defendants' ability to appeal this issue was not forfeited, as plaintiff argues.  On the contrary, the record shows that defense counsel raised a timely objection and requested an admonition on the above comments.  The statements at issue were the very last remarks of plaintiff's counsel's opening argument.  The jury was then immediately excused for a five minute recess.  During the break, out of the presence of the jury, defense counsel objected to plaintiff's counsel's suggestion that the jury "make it painful" for the school district.

> [Defense Counsel]:  Also, Your Honor, we would like to object to the compensatory damage request.  It was specifically mischaracterized as punitive.  I think the jury should be instructed that they can only award compensatory damages to make someone whole, not as a punitive measure.  [¶] I think it was a misstatement of the law and they need to be instructed on it.

> The Court:  Well, curiously, I didn't hear the word "punitive damage."  I just heard give them $10 million for past and $10 million for future.  I didn't hear the word "punitive damages" mentioned.

> [Defense Counsel]:  What was mentioned your honor, was to make an example of them and to make an example for [*sic*] the District.

> [Defense Counsel]:  So even though they're not using the term "punitive damages," the idea or the concept is the same, which is impermissible.

> The Court:  I'm sure you'll point that out and what the instructions are.

6

"'Generally a claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection and a request that the jury be admonished. [Citation.]'" (*Du Jardin v. City of Oxnard* (1995) 38 Cal.App.4th 174, 178.) "'"As the effect of misconduct can ordinarily be removed by an instruction to the jury to disregard it, it is generally essential, in order that such act be reviewed on appeal, that it shall first be called to the attention of the trial court at the time, to give the court an opportunity to so act in the premises, if possible, as to correct the error and avoid a mistrial."'" (*Sabella v. Southern Pac. Co.* (1969) 70 Cal.2d 311, 318.)

Defense counsel made both the requisite objection and request for a curative admonition. The trial court denied the request because it did not hear plaintiff's counsel explicitly demand "punitive damages" against the school district. Defense counsel made this objection in a timely fashion, directly after plaintiff's counsel concluded his opening argument and before defense counsel began his closing argument. (See *People v. Jenkins* (1974) 40 Cal.App.3d 1054, 1057 [an objection and request for admonition concerning remarks made during closing argument is timely if made before jury begins deliberations].) The trial judge did not issue an admonition or an instruction. Therefore, defendants properly preserved this issue for appeal.

The trial court failed to acknowledge the tenor and emphasis of plaintiff's counsel's argumentative phrasing by only referring to the buzzword "punitive." Further, the trial court's suggestion that defense counsel cure the problem during his argument was not appropriate. The judge, not the attorney, states the law and is responsible for correcting wayward argument. The trial court abused its discretion by failing to sustain the objection and give a curative admonition.

It is clear that defendants are liable to Roe for their misguided use of a 12-year-old boy to apprehend a student drug dealer. Plaintiff's counsel's misconduct affected the damages result only. I would therefore reverse and remand for a new trial on damages only.

CHANEY, J.

7